T.C. Memo. 2005-68

UNITED STATES TAX COURT

ALBERT M. GRAHAM AND MARTHA A. GRAHAM, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 587-03.                    Filed March 31, 2005.

<u>W. Rod Stern</u>, for petitioners.

<u>Louis B. Jack</u> and <u>Kevin W. Coy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and penalties as follows:

|       |            | Penalties | |
| Year  | Deficiency | Sec. 6662 | Sec. 6663 |
|-------|------------|-----------|-----------|
| 1995  | $79,701    | --        | $58,241.25 |
| 1998  | 22,412     | $2,187.80 | 48,376.50 |
| 1999  | 55,578     | 190.00    | 1,166.25  |

After trial, respondent filed a motion for leave to file amendment to answer asserting increased deficiencies as a result of petitioners' failure to report $67,437 for 1995 and $87,942.76 for 1998 and additions to tax under section 6651(a)(1) and (2) for failure to timely file their 1998 income tax return and to timely pay the tax shown as due on that return.

After concessions,[1] the issues for decision are:

1.  Whether petitioner[2] had unreported income in 1995 of $112,255.84 as respondent contends, or $70,587 as petitioners contend, from the settlement of his claim for attorney's fees. Resolution of this issue depends on resolution of the following issues:

a.  Whether the statute of limitations bars assessment of these amounts. We hold that it does not.

b.  Whether petitioners are taxable on $47,443.51 petitioners' children received from the Anis Recovery Fund partnership. We hold that they are.

c.  Whether the fair market value of petitioner's 22.375 percent interest in two parcels of real property in which

---

[1] Petitioners concede that, because they had a reasonable prospect of recovery in 1999, the $393,954 embezzlement loss is not deductible in 1999. Petitioners also concede that they are not entitled to business expense deductions for 1998 and 1999. Respondent concedes that Martha A. Graham is not liable for the fraud penalty.

[2] References to petitioner are to Albert M. Graham, Jr.

the partnership owned fractional shares was $37,204, as petitioners contend, or $64,812.33, as respondent contends. We hold that it had a fair market value of $59,629.38.

2. Whether petitioners had unreported income of $12,764 for 1998 and $2,735 for 1999. We hold that they had unreported income of $6,264 for 1998 and $2,735 for 1999.

3. Whether we will grant respondent's motion to amend the answer, and, if so, whether petitioners are liable for increased deficiencies and additions to tax because of their failure to report (a) business income of $67,437 for 1995 and $87,942.76 for 1998 and (b) distributions from the Anis Recovery Fund partnership consisting of an ordinary loss of $2,240 for 1995, a capital gain of $5,594 for 1998, and income of $9,127 for 1999. We will grant respondent's motion, and we conclude that petitioners had unreported income of $67,437 for 1995 and $87,942.76 for 1998, an ordinary loss of $2,240 for 1995, a capital gain of $5,594 for 1998, and income of $9,127 for 1999.

4. Whether petitioner is liable for the fraud penalty under section 6663[3] for 1995, 1998, and 1999. We hold that he is to the extent discussed below.

5. Whether petitioners are liable for the accuracy-related penalty for negligence on a portion of the underpayment of their

[3] Section references are to the Internal Revenue Code, and Rule references are to the Tax Court Rules of Practice and Procedure.

tax for each of the years 1998 and 1999 that is not due to fraud. We hold that they are to the extent discussed below.

6. Whether petitioners are liable for additions to tax under section 6651(a)(1) and (2) for failure to timely file their 1998 income tax return and to pay the tax shown as due on that return. We hold that they are in the amounts of $3,277.35 and $2,549.05, respectively.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A. <u>Petitioners</u>

Petitioners lived in Newport Beach, California, when they filed their petition. Petitioner is an attorney and has practiced law in California since 1969. Mrs. Graham was a travel agent during the years in issue.

Petitioners have owned a cabin in Big Bear, California, since the early 1970s. During the years in issue, petitioner had three personal bank accounts, one of which was at Security First Bank in Big Bear (the Big Bear account).

Donald Lewellen (Lewellen), a certified public accountant, prepared petitioners' income tax returns for tax years 1972 through 1998. He prepared their amended 1998 return in November 1999.

B.    The Redlands Mortgage and the Bogus Encumbrances

In 1995, petitioners were general partners (with about a one-third interest) in a California general partnership that owned a 78-unit apartment building in Corona, California.  The partnership had used the proceeds of a $3.4 million loan from Redlands Federal Bank to buy the building.  By 1995, the value of the building had declined substantially, and the partnership stopped making payments on the Redlands mortgage.

On April 29, 1995, Redlands instituted foreclosure proceedings against petitioners and the other partners.  Attorney Steven Smith (Smith) represented petitioner in that litigation, which was settled in April 1996.  Petitioner owed Smith legal fees of about $41,000 for his representation.

During the Redlands litigation, petitioner became concerned that he would become personally liable for the unpaid balance of the Redlands mortgage.  Donald Sieveke (Sieveke), a California attorney who specialized in bankruptcy law and who rented office space from petitioner during some of the years in issue, advised petitioner to encumber his assets to avoid having to divest himself of assets if he had to file a petition in bankruptcy.

In 1995, petitioners created bogus promissory notes and deeds of trust to make it appear that their properties were encumbered and to protect their assets from creditors such as Redlands Federal.  Petitioners executed documents creating: (1) A

lien relating to his 1956 Mercedes Benz in favor of his friend Lee Cogan (Cogan), even though he did not owe Cogan money; (2) a deed of trust secured by their residence in favor of petitioner's office manager, Charlene Edgar (Edgar), purportedly securing a $164,465.06 debt, even though petitioners did not owe Edgar any money; (3) a deed of trust secured by petitioner's law office building purportedly securing a $50,000 debt owed to petitioner's accountant, James O'Leary (O'Leary), when petitioner owed no money to O'Leary; and (4) a deed of trust in favor of Lewellen for $38,000, when petitioner owed Lewellen $8,000-$10,000 in unpaid accounting fees.  Edgar prepared the deeds of trust, and Sieveke notarized them.

C.   Petitioner's Law Practice

1.   Organization of Petitioner's Law Office

Petitioner was a deputy district attorney in Orange County, California from 1969 to February 1972.  He has specialized in family law since 1983.  Petitioner was a sole practitioner in Santa Ana, California, during the years in issue.  Petitioner's law office is located in a one-story building that he owns.

Edgar began working as petitioner's office manager around 1982.  Edgar took over the bookkeeping and accounting for petitioner's law practice in 1991.  From 1995 to early February 1999, Edgar was responsible for the day-to-day management of the office.  She was primarily responsible for client billing and

banking, and she paid accounts payable, recorded cash receipts, made bank deposits, paid office expenses, and prepared checks for petitioner to sign.

### 2. Petitioner's Business Bank Accounts

Petitioner had two bank accounts for his law practice: a business checking account and a client trust account. The checking account was at Citizens Business Bank from January to November 1998, Washington Mutual Bank from November 1998 to September 1999, and Union Bank from September to December 1999.

### 3. Petitioner's Client Files and Billing Records

Edgar had eight filing cabinets in her office: six for ongoing cases; one for open billing files, and one for closed billing files and receipts. She kept two complete hard copy sets of the billing records. She filed one set alphabetically by client name and the second set chronologically by month. Petitioner knew that Edgar maintained the billing records in the file cabinets. Edgar and petitioner reviewed monthly billings.

### 4. Legal Fees From the Anis Litigation

In 1991, Nick and Patricia Anis (the Anises) sued Allan Stover (Stover) for wrongful termination of Mr. Anis (Anis). Petitioner and Smith jointly represented the Anises. Petitioner and Smith had a contingent fee agreement with the Anises under which petitioner and Smith would receive 50 percent of any recovery obtained in their case against Stover.

Petitioner and Smith agreed to split any fees received in proportion to the hours they each spent on the case. Petitioner worked 44.75 percent of the hours on the case, and Smith worked 55.25 percent. Thus, the Anises, Smith, and petitioner agreed to split any amounts received from the case as follows:

Nick and Patricia Anis    50 percent
Smith                     27.625 percent (50% x 55.25%)
Petitioner                22.375 percent (50% x 44.75%)

The Stover case went to trial, and the jury awarded the Anises damages of $1.2 million in May 1992. Before the judgment was filed, Stover and his wife filed a petition in bankruptcy. Shortly thereafter, the parties agreed to reduce the Stovers' liability to $600,000.

In May 1992, Stover paid $60,000 to the Law Offices of Steven C. Smith, which Smith deposited in his client trust account. On August 4, 1992, Smith paid petitioner $15,060, his 22.375-percent share of Stover's initial payment.

Before making any other payments, the Stovers filed a second petition in bankruptcy on August 30, 1993. On January 21, 1994, the Anises filed a proof of claim in the Stovers' bankruptcy. Petitioner was listed as a secured creditor in some of the bankruptcy pleadings.

5. The Anis Recovery Fund Partnership

In April 1994, Smith, on behalf of himself, the Anises, and petitioner (the Anis parties), began negotiating a settlement

with the Stovers' counsel. The Anis parties decided to form a partnership to hold property they expected to receive from the Stovers.

The initial draft of the partnership agreement provided that the partnership would be owned by Smith, the Anises, and petitioner in proportion to their interests in the recovery; i.e., the Anises 50 percent, Smith 27.625 percent, and petitioner 22.375 percent. In an April 24, 1994 letter, Smith advised the Anises and petitioner that any cash received from the Stovers would be taxable upon receipt, and that they should get a legal opinion as to the tax consequences of the transaction.

In 1995, Smith formed the Anis Recovery Fund partnership (the Anis partnership) to negotiate the bankruptcy court settlement with the Stovers and to hold certain real property that the Anis parties expected to receive under the settlement. Smith was the tax matters partner for the partnership.

On January 24, 1995, Smith wrote to petitioner, the Anises, and Marc Tow, counsel for the Anis parties in the bankruptcy court proceeding. Smith enclosed the settlement agreement and a proposed Anis partnership agreement for Anis and petitioner to sign.

Petitioner told Smith that he wanted his name removed from the partnership agreement and his two children, Drew and Allison Graham, named as partners. Smith removed petitioner's name from

the preamble and signature page of the partnership agreement and listed petitioners' two children as partners with a combined interest in the partnership of 22.375 percent.

Petitioner attended partnership meetings. Smith contacted petitioner, not his children, regarding partnership decisions and other partnership matters. Partnership distributions and correspondence were sent to petitioner's office. Petitioner was the only person who made cash contributions to the partnership when there was a cash call.

On February 24, 1995, the Anises signed a settlement agreement on behalf of the partnership. Under the settlement agreement, on May 30, 1995, the Stovers transferred: (1) $229,538 to the Smith client trust account, (2) a 50-percent interest in the Vivienda Ranch, a 160-acre orchard located in Riverside, California (the Riverside property), to the Anis partnership, and (3) a 25-percent interest in a 40-acre farm in Kansas to the Anis partnership.

On June 6, 1995, Smith wrote two checks from his client trust account totaling $47,443.51; one check for $23,721.76 payable to Drew Graham, and the other check for $23,721.75 payable to Allison Graham. The sum of these two checks equaled a 22.375-percent interest (less expenses) in the $229,538 from the Stovers. On June 23, 1995, petitioners' children cashed the two checks and had them reissued as cashier's checks payable in the

same amounts and to the same payees.  Petitioners' children gave him the money they received from the Anis partnership.

The Anis partnership filed Forms 1065, U.S. Partnership Return of Income, for tax years 1995 through 1999.  The Anis partnership issued Schedules K-1, Partner's Share of Income, Deductions, Credits, etc., for 1995 to Drew Graham and Allison Graham.  The Schedules K-1 indicated that the partnership had allocated an ordinary loss of $1,120 to each.

In May 1996, the partnership sold its interest in the Kansas farm and distributed the proceeds to the Anis partners. Petitioner authorized Smith to apply his children's 22.375-percent share ($5,146.25) from the sale of the Kansas farm against the attorney's fees petitioner owed to Smith for representing him in the Redlands litigation.  He told Smith the partnership funds being distributed were petitioner's funds.

For 1998, on Schedules K-1 it issued to Drew and Allison Graham, the partnership allocated to each of them income of $2,461, consisting of an ordinary loss of $336 and a capital gain of $2,797.

Petitioner told Smith that he would fully pay his attorney's fees when the Anis partnership sold the Riverside property.  The Anis partnership sold the Riverside property and received a payment of $50,000 in December 1998.  In a letter dated December 28, 1998, Smith allocated the $50,000 as follows:  Nick Anis

$27,000, Al Graham $10,292.50, Tammy Smith $2,773.29, and Steve Smith $9,934.21. Smith applied petitioner's $10,292.50 share of the distribution against the attorney's fees petitioner owed him. Smith wrote a check to himself for that amount. In January 1999, petitioner told Smith not to apply any future partnership distributions to petitioner's debt to Smith.

Escrow on the sale of the partnership's interest in the Riverside property closed on February 18, 1999. Additional funds were distributed to the partners, including checks dated March 1, 1999, in the amounts of $75,747.60 and $1,118.75, both jointly payable to Drew and Allison Graham. Drew and Allison Graham endorsed both checks to O'Leary. O'Leary deposited the two checks in his investment account at A.G. Edwards and Sons Inc. O'Leary then wrote a $55,615.64 check from his Merrill Lynch cash management account to petitioner, and that check was deposited in petitioner's law firm's business account and recorded on the books as a loan to petitioner from his children.

The Anis partnership allocated ordinary income of $4,564 to Drew Graham and $4,563 to Allison Graham on Schedules K-1 issued to them for 1999.

6. Petitioner's Diversions of Business Income

a. Diversions of Income Through Edgar

Petitioner and Edgar did not deposit some client payments in the law firm's business account. Petitioner sometimes told Edgar

to cash cashier's checks or other client checks payable to him and to give him the cash. He sometimes endorsed client checks to Edgar, who deposited them in her personal account and wrote a check in an equal amount to petitioner. Edgar's checks to petitioner were deposited in his business account but recorded on the books as nontaxable loans. Petitioner cashed some client checks and deposited some in Sieveke's account instead of depositing them in the business account.

Edgar kept a record of client checks that were not deposited in the business account. She and petitioner referred to that record as the "secret list". The secret list showed the client's name and the amounts of the payments. Edgar kept the "secret list" in the bottom drawer of the credenza in her office. Petitioner knew it was there.

Edgar occasionally signed blank checks drawn on her personal account and gave them to petitioner. Before going on vacation in 1997, Edgar gave petitioner a blank personal check that she had signed and made payable to him. He dated the check June 9, 1997, and wrote the amount, $25,000, and the notation "LOAN" in the memo section. He deposited that check in his business account and recorded it on his books as a nontaxable loan. When Edgar returned from her trip, petitioner told her he had written a $25,000 check on her account. He gave her nine client checks

totaling $25,296 that he had endorsed to her to reimburse her. Edgar deposited those checks in her account on June 17, 1997.

On August 22, 1997, Edgar wrote a check to petitioner in the amount of $6,210. On August 27, 1997, a $6,310 American Savings Bank cashier's check payable to petitioner was deposited in Edgar's account instead of petitioner's business account.

### b. Askew Legal Fees

In 1997, a client, Mr. Askew (Askew), owed a substantial amount of legal fees to petitioner. When Askew filed for bankruptcy, Sieveke filed a claim in bankruptcy court for petitioner for unpaid attorney's fees. Sieveke collected $14,704.67 from Askew and, on August 22, 1997, deposited those funds in Sieveke's client trust account.

Instead of depositing the $14,704.67 in the law firm's business account, on petitioner's instructions: (a) Sieveke wrote checks to the IRS for $10,000 and to the Franchise Tax Board for $3,000 to pay petitioner's personal taxes, and (b) Sieveke paid the $1,704.67 balance to Edgar.

### c. Other Legal Fees Paid to Petitioner and Not Deposited in the Business Account

In 1998, petitioner collected fees totaling $135,421.64 ($100,000 + $22,000 + $13,421.64) from former clients Donald Arnett (Arnett), Angela Chen (Chen), and Brian Markam (Markam). None of these amounts were deposited in petitioner's business

account; instead, these amounts were deposited in O'Leary's money market account at Merrill Lynch in 1998.

In 1998, Sieveke collected $100,000 in disputed legal fees from Arnett and deposited it in his attorney-client trust account. Petitioner told Sieveke to pay the $100,000 to O'Leary. Around March 13, 1998, petitioner delivered Sieveke's $100,000 check, which contained the notation "Al Graham loan repayment", to O'Leary. O'Leary had not lent $100,000 to petitioner, however. O'Leary deposited the $100,000 in his money market account at Merrill Lynch on March 17, 1998. Several days later, petitioner told O'Leary to write a $42,500 check to Edgar and a $3,500 check to petitioner's interior decorator.

Chen paid legal fees of $22,000 to petitioner. Petitioner sent Chen's check to O'Leary, who deposited it in his Merrill Lynch account around May 1, 1998.

Attorney John Gueren collected $13,421.64 in legal fees from Markam for legal services rendered by petitioner. Markam's payment was delivered to O'Leary. O'Leary deposited it in his Merrill Lynch account on July 14, 1998.

From March to September 1998, at petitioner's direction, O'Leary wrote the following checks totaling $119,561 from his Merrill Lynch account:

| Date | Amount | Payee |
|------|--------|-------|
| 11 checks issued on various dates | $109,061 | Charlene Edgar |
| March 18 | 3,500 | Interiors |
| June 24 | 2,500 | Drew Graham |
| Sept. 1 | 4,000 | Donald Lewellen |
| Total: | $119,561 | |

        d.     Payment of Petitioners' Personal Expenses From the Business Account

Petitioner sometimes told Edgar to pay petitioners' personal expenses from the law office's business account and to record them as business expenses. He also sometimes told Edgar to pay his personal expenses from her personal account at Union Bank. For example, Edgar wrote checks to American Express to pay petitioner's wife's bills, Best Buy for new appliances for petitioner's Big Bear cabin, Interiors for remodeling work done on petitioner's cabin, and Big Bear Glass to buy materials for petitioner's cabin. Edgar also wrote a check to Union Bank of California to buy two cashier's checks, one for $25,000 payable to the IRS and one for $8,200 payable to the Franchise Tax Board, to pay petitioner's personal tax bills. Petitioner repaid Edgar by checks drawn on the business account and asked her to record those payments as a reimbursement for office supplies.

Edgar wrote 10 checks from her account in 1998 totaling $46,898.22 payable to petitioner, and she also wrote the following checks in 1998 to pay petitioner's personal expenses or to obtain cash for him:

| Date | Amount | Payee |
|------|--------|-------|
| 10 checks issued on various dates | $46,898.22 | Albert Graham |
| April 8 | $2,470.79 | Cash |
| April 10 | $2,203.52 | American Express |
| April 13 | $1,437.48 | Best Buy |
| April 17 | $500.00 | Cash |
| August 8 | $1,000.00 | Cash |
| August 8 | $33,210.00 | Union Bank |
| August 20 | $1,361.76 | Interiors |
| August 21 | $1,060.35 | Bear City Glass |
| August 28 | $3,800.00 | Interiors |

7. Edgar's Diversion of Money Without Petitioner's Knowledge

The parties stipulated that, from 1993 to 1998, without petitioner's knowledge, Edgar deposited some unreported client payments in petitioner's Big Bear account and wrote checks on that account to pay some of her personal expenses. Edgar deposited $67,437 in 1995, and $87,943 in 1998 in petitioner's Big Bear account.

In October 1998, petitioner discovered that Edgar had been depositing client checks in one of his personal bank accounts that she handled for him. Petitioner told Lewellen late in 1998 that he thought Edgar had embezzled money from his law practice. In November 1998, petitioner and Lewellen went to the bank and obtained a copy of the October 1998 statement for petitioner's business checking account. The statement petitioner obtained from the bank showed greater withdrawal and deposit activity and more checks written on the account than did the copy of the October 1998 statement that Edgar had given to Lewellen.

Over the next few months, petitioner and Lewellen met several times at petitioner's office and at the bank to discuss Edgar's actions.  In January 1999, petitioner told police that he believed Edgar had embezzled funds from his law practice. Detective Perry Francis (Detective Francis) of the Santa Ana Police visited petitioner's office early in February 1999.

On February 4, 1999, petitioner sued Edgar in the Superior Court of Orange County, California, alleging embezzlement, conversion, fraud, breach of fiduciary duty, and unjust enrichment.

Edgar was taken away from petitioner's office by the Santa Ana Police on February 5, 1999, a few days after Detective Francis visited petitioner's office.  She did not remove any files from the office at that time, and she never returned to the office.  Petitioner fired Edgar shortly after February 5.

Sometime after February 5, 1999, petitioner retrieved copies of two altered bank statements from Edgar's computer, and he faxed them to the police.  Detective Francis did not seize Edgar's computer or make a copy of the computer's hard drive.

On October 27, 1999, petitioner sued Lewellen in the Superior Court of Orange County, California, for negligence and breach of contract.  Petitioner claimed that Lewellen had failed to detect Edgar's embezzlement.

At petitioner's request, Detective Francis prepared a letter dated March 3, 2000, in which he stated that, based on his review of available records, he thought Edgar had embezzled $393,953.88 from petitioner.  In reaching that conclusion, Detective Francis assumed that any payment to one of Edgar's charge accounts was an embezzlement.  Detective Francis retired from the Santa Ana Police force on January 1, 2002, before the investigation of Edgar's actions was completed.

After Detective Francis retired, and while the Santa Ana Police criminal investigation of Edgar's embezzlement was ongoing, Edgar's criminal attorney sent a letter to the Orange County District Attorney's Office alleging that petitioner had used Edgar to conceal income and to fraudulently encumber his assets.  Under the direction of Assistant District Attorney Richard Welsh (Welsh), the Santa Ana Police investigated Edgar's allegations.  After the investigation was completed, Welsh concluded that he did not have enough evidence to file embezzlement charges against Edgar.

8. <u>Results of Petitioner's Legal Actions Against Edgar and Lewellen</u>

As a result of petitioner's lawsuit against Edgar, in 2001 petitioner obtained a prejudgment attachment in the amount of $541,915.90 of Edgar's only significant asset, a retirement account at Pershing Royal Alliance.  As a result Edgar filed a petition in bankruptcy in 2001, transferred her $68,000

retirement account to petitioner in 2003, and lost three houses in foreclosure.

Lewellen settled the case with petitioner in October 2001, and agreed to pay petitioner $220,000 in 2002.

D.   Preparation and Filing of Petitioners' Tax Returns

Petitioners filed income tax returns for 1995, 1998, and 1999.  Lewellen prepared the 1995, 1998, and amended 1998 tax returns, but not the 1999 return.

Lewellen recorded petitioner's law firm's gross receipts for 1995 and 1998 on Schedule C, Profit or Loss From Business, based on the total amount of revenues deposited in the firm's business account and recorded as income in the general ledger under "client billings".  Petitioners did not give Lewellen the law firm's accounts receivable, client billings, invoices or receipts supporting the law firm's expenses for 1995 and 1998.

Petitioners deducted personal expenses of $27,636 and $4,476, respectively, as business expenses on their 1998 and 1999 tax returns.

1.   1995

Petitioner did not tell Lewellen that petitioner or his children had received cash and an interest in two parcels of real property through the Anis partnership in 1995.  Petitioners did not report on their initial or amended 1995 return income or loss

from the Anis partnership or from the May 30, 1995, transfer of assets from the Stovers.

2. 1998

Petitioners obtained extensions to file their 1998 individual income tax return on April 15, 1999, and October 15, 1999. Petitioners estimated that their tax liability for 1998 was $41,000, which they paid when they requested the first extension.

Petitioner took various documents, including the Schedules K-1 issued to Drew and Allison Graham for 1998 by the Anis partnership, to Lewellen around October 10, 1999, so he could prepare petitioners' 1998 return. Petitioners gave Lewellen their Quicken records for 1998 so Lewellen could prepare the Schedule C for petitioner's law practice. These included a profit and loss statement dated October 12, 1999, a check register report dated July 28, 1999, and monthly statements and canceled checks for the business bank account.

Petitioners reported $503,549 as gross revenue from petitioner's law practice on their original 1998 income tax return. Lewellen did not include fees totaling $135,421.64 that petitioner received from Arnett, Chen, and Markam in the income reported on petitioners' 1998 return. Lewellen reported the distributive loss from the partnership on Schedule E, Supplemental Income and Loss, of petitioners' 1998 return, and

thus petitioners claimed an ordinary loss of $672 ($336 x 2) on their 1998 return.

Petitioners signed their 1998 return on October 15, 1999. They did not tell Lewellen that he had erroneously reported on that return an ordinary loss from the Anis partnership. Petitioners' 1998 return was mailed on October 15, 1999, and received by the Fresno Service Center on October 18, 1999.

Sometime around November 10, 1999, petitioner called Lewellen and asked him if he had reported "that other income." Petitioner said there was other income that he needed to report on the return, that he did not know the amount, and that he would get back to Lewellen with the exact amount. Petitioner had not previously told Lewellen about the other income. During that phone call, petitioner asked Lewellen to backdate the amended return to Monday, November 8, 1999. On either the afternoon of petitioner's phone call to Lewellen or the next day, petitioner called Lewellen's office and left a message stating the additional amount of income ($135,422). A C.P.A. on Lewellen's staff prepared an amended 1998 return for petitioners on November 10, 1998, on which that additional amount of income from petitioner's law practice was reported. She recorded one hour on her billing sheet for preparing petitioners' 1998 amended return. Lewellen did not bill petitioners for preparing their amended

return. Lewellen signed it on November 10 or 11, 1998.[4] Petitioners did not correct their reporting of the $672 ordinary loss on their 1998 amended return.

Petitioners' signatures on their amended 1998 return are dated November 8, 1999. Petitioners' amended 1998 return was stamped received by the Fresno Service Center on November 22, 1999.

### 3. 1999

Petitioners reported gross receipts of $606,753 from petitioner's law practice on their 1999 return. Petitioners did not report any income from the Anis partnership on their 1999 return. The IRS received petitioners' 1999 return on September 21, 2000.

### E. Audit of Petitioners' Returns

During the audit, petitioner told the revenue agent, K.C. Peredo (Peredo), that payments to contractor Bill Thomas (Thomas) were for building a cabinet for the computer in petitioner's office. However, petitioner paid Thomas with business checks for remodeling the kitchen of his cabin in Big Bear.

During the audit, petitioner denied that he had improperly deducted personal expenses as business expenses. For example, he said he paid Kim Sterling for flowers used solely for his office

---

[4] Petitioner did not allege in the complaint in the lawsuit he filed against Lewellen that Lewellen had failed to include client fees of $135,422 in petitioners' original 1998 return.

that were used for both his home and office.  He said Edgar had misclassified personal expenses as business expenses; however, petitioners improperly deducted $4,476 of personal expenses as business expenses in 1999 after Edgar was fired.

Petitioner incorrectly told Peredo that he did not have any books or billing records because Edgar had them.

Petitioner incorrectly told Peredo that he did not engage in bartering.  Petitioner bartered his services in exchange for services provided by some of his clients.  For example, Thomas owed petitioner $2,300 for petitioner's representation of Thomas in a custody battle with his ex-wife over visitation rights of their son.  Thomas subtracted that amount from the amount petitioner owed him for the kitchen remodeling job.

F.   Respondent's Bank Deposits Analysis

The revenue agent performed a bank deposits analysis and characterized each of petitioner's deposits in his business account as taxable or nontaxable.

Petitioner deposited $572,284 in his law firm's business checking account in 1998.  Included in those deposits were $55,971 from nontaxable sources, as follows: (a) $40,873 allowed by the revenue agent in preparing the notice of deficiency; (b) $10,098 in checks from Edgar traceable to the funds transferred to her from the $135,422 deposited in O'Leary's account; and (c)

$5,000 medical reimbursement to Martha Graham from State Farm insurance.

Petitioner deposited $750,046 in his law firm's business checking account during 1999, of which $140,558 was deposits from a nontaxable source.

OPINION

A.   Whether Distributable Shares Issued to Petitioners' Children by the Anis Partnership Are Taxable to Petitioners

1.   Statute of Limitations

Respondent assessed tax relating to the Anis partnership more than 3 years after petitioners filed their 1995 return. Petitioners contend that assessment of tax on that amount of income is barred by the statute of limitations.

We disagree.  Generally, the Commissioner must assess tax within 3 years after the date of filing of the return.  Sec. 6501(a).  However, the 3-year limit does not apply if the underpayment was due to fraud.  Sec. 6501(c)(1).  That is the case here.  See paragraph D-3-a, below.  Thus, the statute of limitations does not bar assessment of tax on the amounts at issue distributed from Smith's client trust account and the fair market value of a 22.375-percent interest in the property of the Anis partnership.

2. <u>Value of a 22.375-percent Interest in the Property of the Anis Partnership</u>

We next decide the fair market value of a 22.375-percent interest in the property of the Anis partnership.

a. <u>Positions of the Parties</u>

Respondent contends that, on May 30, 1995, the fair market value of petitioner's 22.375-percent interest in the Anis partnership was $112,255.84, consisting of $47,443.51 cash and interest in two parcels of real property having a fair market value of $64,812.33, calculated as follows:

```
$425,637 (½ interest in the Riverside property)*
$ 20,000 (1/4 interest in the Kansas farm)*
$445,637
x 22.375%  (Graham's partnership interest)
$99,711.28
x 65%      (35% minority/marketability discount)
$64,812.33
```

* per partnership's balance sheet

Petitioners contend that the value of a 22.375-percent interest in the cash and property received by the Anis partnership in 1995 was $70,587, calculated as follows: (1) $33,383 for a cash payment to the partnership (cash of $229,538 received by the partnership times 22.375 percent = $51,359, discounted 35 percent = $33,383), plus (2) $35,750 for a one-half interest in the Riverside property ($250,000 fair market value (50 percent interest received by the partnership) times 22 percent = $55,000, discounted 35 percent = $35,750), plus (3) $1,454 for a one-fourth interest in the Kansas farm ($10,000

fair market value for a 25 percent interest received by the partnership, times 22.375 percent = $2,237, discounted 35 percent = $1,454).

      b.   Cash

Smith distributed $47,443.51 in cash to petitioners' children in 1995, which was petitioner's 22.375-percent share of the $229,530 cash received under the Stover bankruptcy settlement. Petitioners included the cash in calculating the value of a 22.375-percent interest in the Anis partnership, to which they applied a 35-percent minority discount. However, petitioners are taxable on the $47,443.51 received by their children because those funds were paid by Smith directly to the children, and that amount is not subject to a minority discount.

      c.   The Riverside Property

A one-half interest in the Riverside property was transferred to the partnership on May 30, 1995.

Based on the book value for the property shown on the Anis partnership's balance sheet, respondent contends that the value of petitioner's 22.375 percent interest in the Riverside property in 1995 was $61,903.58, calculated as follows:

```
$425,637  (½ interest in the Riverside property)*
x 22.375% (petitioner's partnership interest)
$95,236.28
x 65%      (35% minority/marketability discount)
$61,903.58
```

* per partnership's balance sheet

Based on an appraisal provided by petitioners' expert witness, petitioners contend that the fair market value of a one-half interest in the Riverside property was $35,750, calculated as follows:

```
$250,000 (½ interest in the Riverside property)
x 22%    (petitioner's partnership interest)
 $55,000
x 65%    (35% minority discount)
 $35,750
```

Petitioners' expert testified that he relied on several comparables within 10 miles of the Riverside property and adjusted the value for usability of the property and for the time of the comparable sale. He concluded that a 22-percent interest[5] in the partnership's interest in the Riverside orchard had a value of $35,750. Petitioners contend that his appraisal is the only credible evidence of the value of the Riverside property. Petitioners also contend that respondent's reliance on the partnership's unsupported estimate of the value of the Riverside property is unwarranted because Smith testified that the estimated value was not based on an appraisal.

We disagree. First, petitioners' expert's appraisal was a single page of conclusions with no analysis. Second, the balance sheets attached to the Anis partnership returns for 1995-99 stated that the book value for the Riverside property was

---

[5] The 22-percent amount slightly understated petitioner's interest, which was 22.375 percent.

$425,637 ($325,637 for depreciable assets and $100,000 for land). The balance sheet entries are a reasonable indicator of the fair market value of the Riverside property on May 30, 1995, because they were prepared relatively close in time to when the property was placed in the partnership, were made long before the value of the Riverside property was in issue, and were not made in anticipation of litigation.

Third, Smith testified that he thought a one-half interest in the Riverside property had a fair market value of $425,000 when negotiations between the parties in the Stover bankruptcy ended in March 1995. Smith based his estimate on his visit to the property, the documents filed in the Stover bankruptcy, and his discussions with the Anises.

Fourth, Stover listed a value of $400,000 for his one-half interest in the Riverside property on a bankruptcy schedule he filed in August 1993. An owner of property is generally qualified to testify as to the property's value. Fed. R. Evid. 702; see LaCombe v. A-T-O, Inc., 679 F.2d 431, 435 (5th Cir. 1982); Estate of Dunia v. Commissioner, T.C. Memo. 2004-123.

We believe the balance sheets, Smith's testimony, and the Stover bankruptcy schedule, which all are in the same range ($400,000-425,000) for a one-half interest in the Riverside property, are entitled to more weight than petitioners' expert's appraisal. We conclude that the fair market value of the

partnership's one-half interest in the Riverside property was $400,000, and that the fair market value of a 22.375-percent interest in the partnership's interest in that property (after applying a 35-percent discount for marketability) was $58,175.

### d.   Value of the Kansas Farm

A one-fourth interest in the Kansas farm was transferred to the partnership on May 30, 1995.

The parties stipulated (in paragraph 57 of the stipulation of facts) that the fair market value of a 100-percent interest in the Kansas farm on May 30, 1995, was $40,000.  Respondent contends that stipulation 57 should have stated that the partnership's 25-percent interest in the Kansas farm had a fair market value of $40,000.

After trial, respondent filed a motion for relief from stipulation 57 on the grounds that, due to a scrivener's error, it contains a mutual mistake of fact relating to the value of the Kansas farm.  Petitioners contend that there was no mutual mistake and that any mistake was solely respondent's.  See Stamm Intl. Corp. v. Commissioner, 90 T.C. 315 (1988).

We agree with petitioners.  Generally, a stipulation of fact is binding on the parties, and the Court is bound to enforce it. Rule 91(e); Stamos v. Commissioner, 87 T.C. 1451, 1454 (1986). The draft of stipulation 57 exchanged by the parties stated that the Kansas farm had a fair market value of $40,000.  There is no

evidence that the parties made a mutual mistake.  Thus, we will enforce the stipulation, and we conclude that the value of a 25-percent interest in the Kansas farm was $10,000, and that the fair market value of a 22.375-percent interest in the Kansas farm (after applying a 35-percent discount) was $1,454.38.

### e.   Conclusion

We conclude that the total fair market value of petitioner's 22.375-percent interest in the Riverside property and the Kansas farm was $59,629.38, and that the value of petitioner's interest in the cash and the Anis partnership property was $107,072.89.

## B.   Whether Petitioners Had Unreported Income in 1998 and 1999

Respondent's determination that petitioners had unreported income is presumed to be correct, and petitioners bear the burden of proving that it is incorrect.[6]  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Thus, petitioners have the burden of proving that the Commissioner's use of the bank deposits method is inaccurate, for example, by showing that the deposits made into their personal bank accounts are not taxable. Marcello v. Commissioner, 380 F.2d 509, 511 (5th Cir. 1967), affg. T.C. Memo. 1964-303; Price v. United States, 335 F.2d 671,

---

[6] The burden of proof for a factual issue relating to liability for tax may shift to the Commissioner under certain circumstances.  Sec. 7491(a).  Taxpayers bear the burden of proving that they have met the requirements of sec. 7491(a).  H. Conf. Rept. 105-599, at 239 (1998), 1998-3 C.B. 747, 993; S. Rept. 105-174, at 45 (1998), 1998-3 C.B. 537, 581.  Petitioners do not contend that sec. 7491(a) applies in this case.

678 (5th Cir. 1964); DiLeo v. Commissioner, 96 T.C. 858, 871 (1991), affd. 959 F.2d 16 (2d Cir. 1992).

According to respondent's bank deposits analysis, petitioners had unreported income of $12,764 for 1998 and $2,735 for 1999. Petitioners concede that they had unreported income of $2,735 for 1999, and they do not generally dispute respondent's use of the bank deposits method to reconstruct their income for 1998 and 1999. Petitioners contend, however, that they overreported the gross revenue of petitioner's law practice for 1998 by $3,036 ($572,284 deposited less nontaxable deposits of $71,771 = $500,513; $503,549 originally reported less $500,513 = $3,036) because, in addition to $55,971 of nontaxable deposits allowed by respondent, they had the following nontaxable sources of income in 1998:

| | |
|---|---|
| Two checks from Edgar payable to petitioner (#5472, 5475) | $1,800 |
| Check from Pershing Royal Alliance retirement account payable to Edgar and endorsed to petitioner | $7,500 |
| Check payable to Drew Graham from Mrs. Graham and deposited in petitioners' account | $3,250 |
| Check payable to Allison Graham from Mrs. Graham and deposited in petitioners' account | $3,250 |
| Petitioners' total claimed additional nontaxable sources for 1998 | $15,800 |

We conclude that respondent did not subtract all nontaxable sources of deposits to petitioners' account. Specifically, we conclude that the two $3,250 checks written by Mrs. Graham to

petitioners' children and redeposited in petitioners' account are from nontaxable sources.

Petitioners do not explain why they are not taxable on the two checks from Edgar. Both checks were written by Edgar in November 1998 and were not included in the $135,422 deposited in O'Leary's account or reported on petitioners' amended 1998 return. Petitioner's testimony that the $7,500 check from Edgar was a loan is unconvincing. He testified that he did not intend to repay Edgar because he believed that she had stolen money from him. Petitioners did not prove that the checks from Edgar ($1,800) or the retirement account check ($7,500) were from a nontaxable source.

We conclude that petitioners had unreported income of $6,264 ($572,284 deposited - $55,971 nontaxable deposits allowed by respondent - $6,500 additional nontaxable deposits - $503,549 reported on return) for 1998 and $2,735 for 1999.

C.  Whether Petitioners Are Liable for Increased Deficiencies for the Years in Issue

1.  Burden of Proof

The Commissioner has the burden of proving increased deficiencies and penalties pleaded in the answer. Rule 142(a). Thus, respondent bears the burden of proving that petitioners are liable for increased deficiencies and penalties due to their failure to report specific items of business income totaling $67,437 for 1995 and $87,942.76 for 1998 representing client

checks and rent checks that Edgar diverted to petitioner's personal Big Bear bank account and their failure to report distributions from the Anis partnership in 1998 and 1999.

2.  Petitioners' Unreported Income for the Years in Issue

Petitioners deducted theft losses based on Edgar's unauthorized use of petitioner's funds deposited in the Big Bear account.  To support their theft loss deduction, petitioners admitted that they had failed to report legal fees and rental income of $67,437 for 1995 and $87,942.76 for 1998 which had been deposited by Edgar in petitioners' Big Bear account but not deposited in petitioner's law firm account, recorded in his client billings records, or reported on their returns for 1993-98.  Respondent contends that petitioners are liable for tax on (a) those amounts, and (b) distributions from the Anis partnership consisting of an ordinary loss of $2,240 for 1995, a capital gain of $5,594 for 1998, and income of $9,127 for 1999.  These amounts were not taken into account in the notice of deficiency.

3.  Whether To Allow Respondent To Amend the Answer

After trial, respondent filed a motion for leave to file amendment to answer asserting increased deficiencies and additions to tax as a result of respondent's allegation that petitioners failed to report $67,437 for 1995 and $87,942.76 for 1998.  The parties may amend their pleadings only by leave of the

Court, and leave shall be given freely when justice so requires. Rule 41(a). A party may move to amend the pleadings to conform to the proof presented at trial. Rule 41(b)(2). Prejudice to the other party is the key factor in deciding whether to allow an amendment to the pleadings. Kroh v. Commissioner, 98 T.C. 383, 389 (1992).

To support their claim for a theft loss deduction, petitioners provided evidence showing that they had not reported certain income. We believe they are not prejudiced by respondent's request that the Court also consider that evidence to find increased deficiencies. See Sharvy v. Commissioner, 67 T.C. 630, 641-642 (1977), affd. 566 F.2d 1118 (9th Cir. 1977). Respondent may amend the pleadings to conform to the proof. Rule 41(b)(2).

4. Whether Petitioners Are Liable for Increased Deficiencies Due to Their Failure To Report Legal Fees and Rental Income

Petitioners contend that they are not taxable on unreported legal fees and rental income of $67,437 for 1995 and $87,942.76 for 1998 because Edgar embezzled at least that much from them without petitioners' knowledge.

We disagree that petitioners are not taxable on these amounts. Edgar diverted legal fees and rental checks by depositing them into petitioner's Big Bear account. Petitioner had access to those funds, which were commingled with other funds

in his Big Bear account.  Income earned by the taxpayer and deposited into his bank account is taxable to him, even if he fails to keeps track of how much money he has in the account. See Donohue v. Commissioner, 323 F.2d 651 (7th Cir. 1963), affg. 39 T.C. 91 (1962).

Petitioner discovered the losses in 1998, and he sued Edgar and Lewellen in 1999.  The Lewellen lawsuit was resolved in 2002 and the Edgar lawsuit in 2003.  If a casualty or other event occurs which results in a loss and there exists a claim for reimbursement with respect to which there is a reasonable prospect of recovery, no loss is allowable as a deduction until the tax year in which the taxpayer can ascertain with reasonable certainty whether reimbursement will be received.  Secs. 1.165-1(d)(2)(i), 1.165-1(d)(3), 1.165-8(a)(2), Income Tax Regs.

A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for reimbursement from a third party and when there is a substantial possibility that such claim will be resolved in the taxpayer's favor.  See Ramsay Scarlett & Co v. Commissioner, 61 T.C. 795, 811 (1974), affd. 521 F.2d 786 (4th Cir. 1975).  Petitioners may not deduct embezzlement losses for any of the years in issue because (1) Edgar had a retirement account and three houses in the years in issue, and (2) petitioners conceded at trial that they still had a reasonable prospect of recovery in 1999.

5. <u>Whether Petitioners Are Liable for Increased Deficiencies Due to Their Failure To Report Their Distributable Shares in the Anis Partnership</u>

Petitioners contend that they are not taxable on their distributable shares in the Anis partnership (an ordinary loss of $2,240 for 1995, a capital gain of $5,594 for 1998, and income of $9,127 for 1999) because these amounts were not paid for petitioner's personal services. Petitioners contend that petitioner gave his 22.375-percent interest in the Anis partnership to his children and that the income in dispute was generated by the Anis assets and thus is not includable in petitioners' income.

We disagree. Petitioner was the beneficial owner of and was taxable on these items for the following reasons. First, petitioner's interest in the partnership derived from the services he performed in the Anis litigation. Income is taxable to the taxpayer who earns and controls it. <u>Lucas v. Earl</u>, 281 U.S. 111 (1930).

Second, petitioner intended to be a partner in the Anis partnership. He attended partnership meetings. Smith contacted petitioner, not his children, regarding partnership decisions and other partnership matters. Partnership distributions and correspondence were sent to petitioner's office. Petitioner was the only person who made cash contributions to the partnership when there was a cash call.

Third, petitioner controlled the disposition of and benefited from the partnership distributions. For example, petitioner owed Smith about $41,000 from his Redlands representation, and he used the 1996 and 1998 partnership distributions ($5,146.25 from the Kansas farm and $10,292.50 from the Riverside property) to reduce his debt to Smith. In 1999, the partnership distributed checks in the amounts of $75,747.60 and $1,118.75, both jointly payable to petitioners' children. Both checks were endorsed to O'Leary who deposited them in his investment account. O'Leary then paid $55,615.64 of this money to petitioner as a purported loan from his children, and he kept the rest. Petitioner treated the partnership distributions as if they were his, and he told Smith that they were his.

Fourth, petitioners reported the partnership loss on their 1998 return, which is an admission that petitioner, and not his children, owned the partnership interest. See Waring v. Commissioner, 412 F.2d 800, 801 (3d Cir. 1969), affg. per curiam T.C. Memo 1968-126.

For these reasons, we do not recognize petitioner's transfer of his Anis partnership interest to his children for Federal income tax purposes. Estate of Sanford v. Commissioner, 308 U.S. 39 (1939); sec. 25.2511-2(b), (g)(1), Gift Tax Regs. Thus, petitioners are taxable on the distributions from the Anis partnership in 1998 and 1999.

D. Whether Petitioner Is Liable for the Penalty for Fraud Under Section 6663(a)

1. Background

Respondent contends that petitioner is liable for the penalty for fraud under section 6663(a) for 1995, 1998, and 1999. Respondent has the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). Respondent must establish: (a) Petitioner underpaid tax for each year in issue, and (b) some part of the underpayment is due to fraud. Sec. 6653(b); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989). Petitioners concede that they underpaid tax for 1995, 1998, and 1999. If respondent shows that any part of an underpayment is due to fraud, the entire underpayment is treated as due to fraud unless the taxpayer shows by a preponderance of the evidence that part of the underpayment is not due to fraud. Sec. 6663(b).

Fraud is the intentional evasion of a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud is never presumed; it must be established by affirmative evidence. Beaver v. Commissioner, 55 T.C. 85, 92 (1970). The Commissioner may prove fraud by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. See Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

2.  Badges of Fraud

Courts have developed several objective indicators, or "badges", of fraud.  Recklitis v. Commissioner, 91 T.C. 874, 910 (1988).  The following badges of fraud are present in this case as to petitioner for the years shown: (a) Substantially understating his income by diverting it to his children (1995, 1998, 1999), attorney (1998), C.P.A. (1998), and office manager (1995, 1998); (b) concealing income from petitioners' tax return preparer (1998); (c) having false or inadequate books and records; (d) creating false legal documents and concealing assets from potential creditors (1995); (e) disguising personal expenses as business expenses (1998, 1999); (f) concealing income through complex series of transactions and nominees (1995, 1998); and (g) giving implausible or inconsistent explanations to respondent's examiner and in court about events during the years in issue.

a.  Substantially Understating Income

A pattern of substantially underreporting income for several years is strong evidence of fraud.  Holland v. United States, 348 U.S. 121, 137-139 (1954); Spies v. United States, 317 U.S. 492, 499 (1943).  Petitioners substantially underreported their income in 1995, 1998, and 1999.

Petitioner testified that he thought the partnership income was not taxable to him because it was "vested" in the partnership

and not in him, and that he thought it was a loan from his children. Petitioner's testimony in this regard is not credible.

Petitioners contend that Lewellen and Smith told petitioner he did not need to report the Anis income. We disagree. Petitioners' claimed reliance on Lewellen and Smith for failure to report the Anis income in 1995 is not credible. First, Lewellen did not know about the Anis partnership distributions in 1995. Second, in an April 28, 1994, letter to petitioner and the Anises, Smith specifically advised that any cash received from the Stovers would be taxable on receipt.

      b.    <u>Concealing Income From the Taxpayer's Return Preparer</u>

Concealing income from one's return preparer can be evidence of fraud. <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; <u>Farber v. Commissioner</u>, 43 T.C. 407, 420 (1965), modified 44 T.C. 408 (1965). Petitioner did not tell Lewellen until after Lewellen had filed petitioners' 1998 return in October 1999 that petitioner had received client fees of $135,422 in 1998 and had arranged to have those fees deposited in O'Leary's account.

Petitioners contend that petitioner told Lewellen about the $135,422 before Lewellen prepared their original 1998 return, and that Lewellen was to blame for their failure to report the $135,422 in income. We disagree. Petitioner did not tell Lewellen or give Lewellen records showing that petitioner had

received the $135,422 in client fees collected from Arnett, Chen, and Markham in 1998. Petitioner had those funds sent to O'Leary and did not deposit them in his law firm account. Petitioner concealed those items from Lewellen. Similarly, there is no evidence that petitioner gave Lewellen information about or, with the exception of the 1998 Schedules K-1, records of the cash and property distributed by the Anis partnership in 1995 and 1998.

Petitioner testified that he realized Lewellen had not included the $135,422 of legal fees in petitioners' 1998 income because the figure on the Quicken printout "matched the figure on the original tax return." Petitioner's claim is implausible because the Quicken printout did not include the $135,422.

Similarly, petitioner did not tell Lewellen that $47,443.51 and an interest in two parcels of real property were acquired in 1995 by petitioners' children as partners in the Anis partnership in return for services petitioner performed in the Anis litigation. Thus, petitioners' claim that his failure to report that income for 1995 was due to his reliance on Lewellen's advice is implausible.

c. Having False or Inadequate Books and Records

Petitioner's Quicken records failed to include payments for his services that were listed in the "secret list" kept by Edgar. Petitioner knew about the secret list. The secret list disappeared while it was in petitioner's control. A taxpayer's

failure to maintain accurate records or concealment of records
may be a badge of fraud.  Merritt v. Commissioner, 301 F.2d 484,
487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Reaves v.
Commissioner, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C.
690 (1958); Grosshandler v. Commissioner, 75 T.C. 1, 20 (1980).

> d.    Creating False Legal Documents and Concealing
>       Assets From Potential Creditors

Backdating or creating false documents may be a badge of
fraud.  See Tyrell v. Commissioner, T.C. Memo. 1995-568; Smith v.
Commissioner, T.C. Memo. 1995-402, affd. 116 F.3d 492 (11th Cir.
1997); Savage v. Commissioner, T.C. Memo. 1992-129.  Concealing
assets from potential creditors may be evidence of a taxpayer's
willingness to conceal income from the Internal Revenue Service.
See Freidus v. Commissioner, T.C. Memo. 1999-195; McDonald v.
Commissioner, T.C. Memo. 1996-87, affd. 114 F.3d 1194 (9th Cir.
1997); Ashdown v. Commissioner, T.C. Memo. 1989-40; Gay v.
Commissioner, T.C. Memo. 1968-226; see also United States v.
Scott, 37 F.3d 1564 (10th Cir. 1994).

In 1995, petitioners created bogus promissory notes and
deeds of trust in favor of Cogan, Edgar, Lewellen, and O'Leary to
make it falsely appear that petitioners' properties were
encumbered and to protect them from potential creditors.

> e.    Disguising Personal Expenses as Business Expenses

The practice of claiming personal expenses as business
expenses may be evidence of fraud.  Lowy v. Commissioner, 262

F.2d 809 (2d Cir. 1959), affg. T.C. Memo. 1957-77; Am. Rolbal Corp. v. Commissioner, 220 F.2d 749 (2d Cir. 1955), affg. per curiam T.C. Memo. 1954-67; Hicks Co. v. Commissioner, 56 T.C. 982, 1019, 1030 (1971), affd. 470 F.2d 87 (1st Cir. 1972); Benes v. Commissioner, 42 T.C. 358, 383 (1964), affd. 355 F.2d 929 (6th Cir. 1966).  Petitioners deducted personal expenses as business expenses on their 1998 and 1999 returns, such as payments to American Express for petitioner's wife's bills, Best Buy for new appliances for petitioners' Big Bear cabin, Interiors for remodeling work done on petitioners' cabin, Big Bear Glass to buy materials for petitioners' cabin, and Union Bank of California to buy two cashier's checks to pay petitioners' personal taxes.  We reject petitioners' attempt to blame Edgar for their deduction of personal expenses as business expenses because petitioners continued to improperly deduct personal expenses, such as payments to their home gardener and to Kim Sterling for flowers, in 1999 after Edgar left, and we believe Edgar's testimony that she did what petitioner told her to do.

####     f.   Concealing Income Through a Complex Series of Transactions and Nominees

A taxpayer's use of a complex series of financial transactions and nominees may be evidence of the taxpayer's attempt to conceal income and remove it from the Government's reach.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  Petitioner concealed income by

having Sieveke and John Gueren collect attorney's fees owed to petitioner and delivering them to O'Leary, who deposited those funds in his money market account and then funneled the funds to Edgar and back to petitioner. Petitioner told Edgar he was doing this because he thought he was paying too much tax.

g. <u>Giving Implausible or Inconsistent Explanations</u>

Implausible or inconsistent explanations of behavior by a taxpayer can show fraudulent intent. <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; <u>Bradford v. Commissioner</u>, <u>supra</u> at 307; <u>Bahoric v. Commissioner</u>, 363 F.2d 151, 153 (9th Cir. 1966), affg. T.C. Memo. 1963-333. Many of petitioner's explanations of his behavior were implausible or inconsistent.

Petitioner testified inconsistently regarding the distributions from the Anis partnership. He testified that his children received a $47,000 distribution in 1995, which they lent to him, but he thought the money was theirs because they were members of the Anis partnership. He also testified that any cash that came out of the Anis partnership in 1995 belonged to him, that he didn't know whether the money was received by himself or his children, and that he chose not to be a partner in the partnership only with respect to the parcels of real property held by the partnership.

Petitioner's testimony concerning Edgar's computer records was vague and contradictory. He testified that he did not print

a copy of his billing records for the revenue agent because she never asked him to do so. Petitioner could have, but did not, print copies of the billing records from Edgar's computer for the revenue agent. Instead, when the revenue agent asked for his billing records, petitioner said he "didn't have any." Petitioner falsely said that he did not know what records were on Edgar's computer, did not know how to use it, and never asked anyone for help printing billing records. He testified that a computer expert helped him retrieve password-protected documents from Edgar's computer after she was fired. Petitioner testified that he used Edgar's computer after she was fired, but he stated at a deposition in 2001 that he would not have been able to point out which computer was hers.

Petitioner testified that he did not know that O'Leary was paying money to Edgar, even though petitioner told O'Leary to send money to Edgar. Petitioner incorrectly told the revenue agent that he had told Lewellen about the Anis partnership distribution and Lewellen included it in income.

### h. Conclusion

Respondent has proven by clear and convincing evidence that petitioner underpaid tax due to fraud for 1995, 1998, and 1999.

### 3. Items Attributable to Fraud

The entire underpayment is treated as attributable to fraud, except to the extent petitioners establish otherwise.

Sec. 6663(b); Marretta v. Commissioner, T.C. Memo. 2004-128; Peyton v. Commissioner, T.C. Memo. 2003-146.

a. Omission of Anis Partnership Income in 1995

Petitioner contends that his failure to include in income for 1995 amounts he received from the Anis partnership was not due to fraud. We disagree.

Petitioner testified that he gave his interest in the Anis partnership to his children in 1995 to divest himself of assets that could be seized to satisfy his potential liability in the Redlands litigation. Petitioner testified that the $47,443 he received from his children was a loan. However, no documentary evidence supports petitioner's claim. Petitioner's books for 1995 do not show deposits of loan proceeds in the amount of $47,443 or during June 1995, when petitioners' children allegedly lent him the money. Petitioner does not explain why his children received $47,443.51 in cash, converted it to cashier's checks, and then purportedly lent it to petitioner. We believe petitioner tried to conceal his receipt of attorney's fees from the Anis partnership by diverting them through his children.

Petitioner testified that he did not report the amounts that petitioners' children received from the Anis partnership because Lewellen told him it was not income to him. Petitioner's claim is unconvincing in view of Lewellen's credible testimony that petitioner did not tell him that petitioner or his children had

received cash and an interest in two parcels of real property through the Anis partnership in 1995.

Petitioner has not shown that his failure to include in income for 1995 amounts from the Anis partnership ($107,073) for settlement of his claim for attorney's fees was not due to fraud. Thus, petitioner is liable for the addition to tax under section 6663 with respect to the underpayment for 1995 attributable to the Anis partnership distributions.

### b. Income Diverted by Edgar in 1995 and 1998

The parties stipulated that Edgar deposited $67,437 in 1995 and $87,943 in 1998 in petitioner's Big Bear checking account and paid some of her personal expenses from that account, and we have found that she did so without his knowledge or consent. Thus, petitioners' failure to report income of $67,437 in 1995 and $87,943 in 1998 attributable to Edgar's diversion of those funds was not due to fraud.

### c. Client Fees Omitted From Original 1998 Return and Reported on Amended 1998 Return

Petitioner admits that client fees of $135,422 were deposited in O'Leary's account in 1998 and were not deposited in petitioner's law firm account. Petitioner contends that these fees were sent to O'Leary to be invested, not to be concealed from respondent. Petitioner claims that he told Lewellen about those fees, but Lewellen erroneously failed to report them on petitioners' original 1998 return. Petitioner claims that he and

Mrs. Graham signed the amended 1998 return on November 8, 1999. Petitioners point out that Lewellen did not charge for his service for preparing the amended 1998 return, and argue that this suggests that the error was Lewellen's, not petitioners'. We disagree.

Lewellen credibly testified that he did not know petitioner had received client fees of $135,422 in 1998 until petitioner telephoned him shortly after the original 1998 return was filed. He also credibly testified that petitioners' amended 1998 return, dated November 8, 1999, was prepared several days after that date and backdated at petitioner's request. In his 1999 lawsuit alleging that Lewellen had negligently prepared petitioners' 1998 tax return, petitioner did not refer to the fact that Lewellen had not included client fees of $135,422 in petitioners' original 1998 return.

Petitioner contends that he discovered the omission of the $135,422 when he looked at a Quicken printout of law office income and compared it to his original 1998 return several days after mailing that return. Petitioner's claim is unconvincing because the parties stipulated and he admitted at trial that the Quicken printout he gave to Lewellen on October 13, 1999, to prepare the 1998 return did not include the $135,422.

Petitioner contends that the omission of $135,422 was an innocent oversight, and that he had no fraudulent intent

regarding his failure to report that income on the original 1998 return as shown by the fact that he acted to amend his return to report this amount a few weeks after he filed his original 1998 return. We disagree. Petitioner used a complex series of transactions and transfers of funds through several individuals in an attempt to conceal this income both from Lewellen and the IRS. Petitioner's explanations for these transactions are implausible. For example, his claim that he gave O'Leary the $135,422 to invest for him is belied by the fact that O'Leary transferred the funds back to petitioner shortly thereafter. We conclude that petitioner fraudulently failed to include the $135,422 in income on the original 1998 return.[7]

     d.   Personal Expenses Claimed as Business Deductions

Petitioners admitted that they improperly deducted personal expenses of $27,636 in 1998 and $4,476 in 1999 as business expenses on their 1998 and 1999 tax returns. However, they contend that they did not fraudulently deduct those expenses. Petitioners argue that Edgar is to blame for the majority of these errors in 1998, and point out that the amount of misclassified expenses dropped from $27,636 in 1998 to $4,476 in 1999 when Edgar was no longer responsible for petitioner's

---

[7] See Badaracco v. Commissioner, 464 U.S. 386, 394 (1984); United States v. Hanson, 2 F.3d 942, 946 n.1 (9th Cir. 1993) (a taxpayer who files a fraudulent return does not purge the fraud by subsequent voluntary disclosure; the fraud was committed, and the offense completed, when the original return was filed).

business records.  Lewellen credibly testified that he did not know that petitioners improperly deducted personal expenses as business expenses on their 1998 return.  We reject petitioners' attempt to shift the blame to Edgar for their deduction of personal expenses as business expenses because petitioners continued to improperly deduct personal expenses, such as payments to their home gardener and to Kim Sterling for flowers, in 1999 after Edgar left.

E.    Accuracy-Related Penalty

Respondent contends that petitioners are liable for the accuracy-related penalty for negligence on the portion of the underpayment of their tax for each of the years 1998 and 1999 that is not due to fraud.  A taxpayer may be liable for a penalty of 20 percent on the portion of an underpayment of tax due to negligence or disregard of rules or regulations.  Sec. 6662(b).  However, section 6662 does not apply to any portion of an underpayment subject to the fraud penalty under section 6663.  Id.  In the case of a joint return where one spouse is found liable for fraud, the accuracy-related penalty cannot be imposed on the other spouse because imposing the accuracy-related penalty on the other spouse, sec. 6663(c), would result in "impermissible stacking".  Zaban v. Commissioner, T.C. Memo. 1997-479.

In court proceedings arising in connection with examinations beginning after July 22, 1998, section 7491(c) places on the

Commissioner the burden of producing evidence that it is appropriate to impose the accuracy-related penalty for negligence under section 6662(a).  Section 7491(c) applies because the examination of petitioners' returns for 1998 and 1999 (two of the tax years in issue) began after July 22, 1998.

To meet the burden of production under section 7491(c), the Commissioner must produce evidence showing that it is appropriate to impose the particular penalty, but need not produce evidence relating to defenses such as reasonable cause or substantial authority.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); H. Conf. Rept. 105-599, at 241 (1998), 1998-3 C.B. 747, 995.

Respondent has met the burden of production with respect to the negligence penalty because the record shows that petitioners knowingly understated their income and claimed improper deductions for personal expenses.  See Snyder v. Commissioner, T.C. Memo. 2001-255; Caralan Trust v. Commissioner, T.C. Memo. 2001-241.  Petitioners have not shown that they acted with reasonable cause or in good faith.  They claim that they took reasonable steps to report their income and that the deficiencies were de minimis.  We disagree that they acted reasonably to avoid the errors discussed herein, and that the negligence penalty does not apply to errors of this magnitude.  See sec. 6662(b)(1).

F.   Whether Petitioners' Forms 4868 Are Valid

1.   Petitioners' Contentions and Background

Petitioners contend that the Form 4868 request for automatic 4-month extension that they filed for 1998 is valid because they took reasonable steps to report their income to Lewellen, he inadvertently failed to include $135,422 in income for 1998, and they corrected that error by filing an amended return for 1998 three weeks after they filed their original return.

A calendar year taxpayer generally must file returns by April 15 after the close of the calendar year.  Sec. 6072(a). The Commissioner may grant a reasonable extension of time to file a return.  Sec. 6081(a).  A 4-month extension is automatic if a taxpayer timely files a properly prepared Form 4868.  Sec. 1.6081-4(a)(1) and (2), Income Tax Regs.

A Form 4868 is invalid if the taxpayer fails to properly estimate his or her tax liability based on information available to the taxpayer when the extension is requested.  Clayton v. Commissioner, 102 T.C. 632, 650 (1994); Crocker v. Commissioner, 92 T.C. 899, 908, 911 (1989).  A taxpayer must estimate his or her tax liability carefully and must make a reasonable attempt to find information on which to base the estimate.  Crocker v. Commissioner, supra.  The mere fact that a taxpayer underestimates his or her tax liability does not invalidate a Form 4868 or void an automatic extension.  Id. at 907.

2.    Whether Petitioners Properly Estimated Their Tax

Petitioners contend that they estimated their tax with reasonable care on Form 4868 for 1998.  Petitioners estimated that their tax liability for 1998 was $41,000, which they paid when they filed their Form 4868.  This amount was less than one-half of their actual liability.  They contend that their error in underreporting $135,422 on their extension request and their original 1998 return was attributable to Lewellen, not to petitioners.

We disagree.  Lewellen credibly testified that he was unaware that petitioner had received client fees of $135,422 in 1998 until petitioner telephoned him shortly after the original 1998 return was filed.  Lewellen did not know that petitioners improperly deducted $27,000 of personal expenses as business expenses on their 1998 return.  Petitioners' failure to properly estimate their 1998 tax liability invalidates their extension.

3.    Whether Petitioners Are Liable for an Addition to Tax for Failure To Timely File and Pay Under Section 6651(a)(1) and (2)

Section 6651(a)(1) provides for an addition to tax up to 25 percent for failure to timely file Federal income tax returns.  Section 6651(a)(2) provides for an addition to tax for failure to pay taxes shown on a return on or before the payment due date.  The additions to tax under section 6651(a)(1) and (2) do not apply if the failure was due to reasonable cause and not willful

neglect.  <u>United States v. Boyle</u>, 469 U.S. 241, 245 (1985); <u>Baldwin v. Commissioner</u>, 84 T.C. 859, 870 (1985); <u>Davis v. Commissioner</u>, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985).

Respondent bears the burden of production under section 7491(c) and the burden of proving whether petitioners are liable for the addition to tax for failure to timely file and timely pay because it was first raised in respondent's answer under Rule 142(a).  Petitioners relied on the automatic extension for 1998 as a defense to the addition to tax for failure to timely file under section 6651(a).  Reliance on an automatic extension is not reasonable cause for a taxpayer's failure to timely file a return or timely pay if the taxpayer failed to properly estimate his or her tax liability in requesting the extension.  <u>Crocker v. Commissioner</u>, <u>supra</u> at 913.  We conclude that petitioners are liable for the addition to tax under section 6651(a)(1) and (2) for 1998.

To reflect the foregoing and the concessions of the parties,

<u>Decision will be entered under Rule 155</u>.