T.C. Memo. 2011-260

UNITED STATES TAX COURT

MARTIN G. PLOTKIN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17775-08.                  Filed November 3, 2011.

Sanford J. Boxerman, for petitioner.

Michael D. Zima, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  Respondent determined deficiencies in
petitioner's Federal income taxes of $108,652, $61,885, $52,397,
$45,490, and $320,852 for tax years 1991, 1992, 1993, 1994, and
1995, respectively, as a result of underreported or unreported
income that should have been reported on Schedule C, Profit or
Loss From Business, and of unpaid self-employment taxes and a

disallowed deduction for home mortgage interest for 1991. Respondent also determined penalties for fraud under section 6663[1] of $78,447.75, $46,413.75, and $39,297.75 for 1991, 1992, and 1993, respectively, as well as additions to tax for fraudulent failure to file under section 6551(f) of $32,980.25 and $232,617.70 for 1994 and 1995, respectively. Respondent further determined additions to tax for failure to pay estimated taxes under section 6654 of $2,343.73 and $17,515.76 for 1994 and 1995, respectively, as well as additions to tax under section 6651(a)(2) of $11,372.50 and $80,213 for 1994 and 1995, respectively. Petitioner now claims to be entitled to various deductions totaling $267,472, $175,323, $124,356, and $111,773 for 1991, 1992, 1993, and 1994, respectively. Respondent later conceded that petitioner is not liable for additions to tax under section 6651(a)(2) or for self-employment taxes for 1995. Petitioner conceded that he is not entitled to a deduction for home mortgage interest of $16,000 for 1991. After concessions, the issues remaining for decision are:

(1) Whether petitioner underreported Schedule C income by $302,319, $172,081, and $138,490 for 1991, 1992 and 1993, respectively. We hold that he did;

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

(2) whether petitioner is entitled to deductions of $267,472, $175,323, $124,356, and $111,773 for 1991, 1992, 1993, and 1994, respectively. We hold that he is not;

(3) whether petitioner failed to report Schedule C income of $135,611 and $805,246 for 1994 and 1995, respectively. We hold that he failed to report $135,611 for 1994 and $217,246 for 1995;

(4) whether petitioner is liable for self-employment taxes of $10,247, $10,658, $10,851, and $11,146 for 1991, 1992, 1993, and 1994, respectively. We hold that he is;

(5) whether petitioner is liable for additions to tax for failure to pay estimated taxes under section 6654 for 1994 and 1995, respectively. We hold that he is;

(6) whether petitioner is liable for fraud penalties under section 6663 for 1991, 1992, and 1993, and for fraudulent failure to file additions to tax under section 6651(f) for 1994 and 1995. We hold that he is liable for such penalties or additions for 1991, 1992, 1993, and 1994, but not liable for 1995.

FINDINGS OF FACT

At the time the petition was filed, petitioner resided in Florida.

1. Background of Petitioner and Corporate Structure

Petitioner graduated from the University of Pennsylvania, Wharton School of Business, in 1963 with a bachelor of science

degree in economics. While attending the Wharton School of Business, petitioner took two accounting classes. Petitioner also earned a law degree from St. Louis University in 1972 and worked as an attorney on corporate cases for about 2-1/2 years.

Medigroup Enterprises, Inc. (Medigroup Enterprises), was incorporated in the 1960s by Harvey Friedman, the father of petitioner's ex-wife. During the 1970s, Medigroup Enterprises purchased several nursing homes which it owned and operated through related entities. In 1980 petitioner purchased a controlling interest in Medigroup Enterprises. The record is unclear on several facts relating to Medigroup Enterprises and its related entities because of evidentiary gaps, multiple changes in control/ownership of the entities, and similarly named related entities which were not specifically identified in trial testimony. Medigroup Enterprises filed many of its corporate income tax returns several years late.

Rolla Health Care Associates, L.P. (RHCA), was a Missouri limited partnership formed in 1978 to build and operate a nursing home in Rolla, Missouri (Rolla nursing home). The Secretary of the U.S. Department of Housing and Urban Development (HUD) agreed to insure the mortgage on the Rolla nursing home.

RHCA was part of a complex and confusing group of partnerships and corporations related to Medigroup Enterprises. At the time of its formation in 1978, RHCA had two partners: The

general partner, Rolla Health Care, Inc., which owned a 1-percent interest in RHCA, and the limited partner, Medigroup, Inc. (Medigroup), which owned the remaining 99-percent interest.

Rolla Health Care, Inc., was incorporated in Missouri in 1978 by petitioner, who was the registered agent and vice president of the corporation. By 1987 petitioner was the sole officer and member of the board of directors. However, between December 1987 and March 1989, Vernon Ray Lavender (Mr. Lavender) had become the sole officer and member of the board of directors. Mr. Lavender was a friend of petitioner and had worked with petitioner since 1982.

Medigroup was related to, but separate from, Medigroup Enterprises. Petitioner was the sole director and member of the board of directors in 1987. Just as with Rolla Health Care, Inc., Mr. Lavender became the sole officer and member of the board of directors of Medigroup between December 1987 and March 1989.

During 1982 Medigroup sold its 99-percent stake in RHCA to Lee Kling, a St. Louis businessman. In 1986 Mr. Kling sold his 99-percent stake in RHCA to Health Facilities Investment Co., Ltd. (Health Facilities), a limited partnership formed by petitioner. In 1990 petitioner changed the name of Health Facilities to Autumn Years Investments, L.P. (Autumn Years). Also in 1990, the 1-percent general partnership interest in RHCA

was reallocated among Rolla Health Care, Inc., Medigroup, and Mr. Lavender. In 1991 the interests of Medigroup and Mr. Lavender in RHCA converted from general partnership interests to limited partnership interests. This change did not affect Autumn Years' 99-percent limited partnership interest in RHCA.

At some time not clear from the record, Medigroup came under the ownership of KSFS Investment Co. (KSFS), a holding corporation whose stock was owned by petitioner. Petitioner then sold his KSFS stock to Mr. Lavender for $500 in 1987. While petitioner estimated the value of the KSFS stock between $100,000 and $150,000, petitioner claims to have gone through with the deal because it allowed him to place the responsibility of running the nursing home business upon Mr. Lavender. At trial, Mr. Lavender admitted that during his business relationship with petitioner, Mr. Lavender embezzled significant amounts of money from RHCA and related businesses.

Petitioner made each of his three children a 25-percent partner in Autumn Years. Other partners included Eva Sue Faenger (Ms. Faenger), petitioner's ex-girlfriend, with a 20-percent share, Lynn Plotkin, petitioner's ex-wife, with a 4-percent share, KSFS with a .8-percent share, Medigroup Care Centers, Inc. (another company related to Medigroup Enterprises), with a .1-percent share, and Management & Development Associates, Inc. (of which petitioner was the sole shareholder), with a .1-percent

share.  As of January 2001, the three children were unaware that they were members of the partnership.  Lynn Plotkin was also unaware she was a partner.  Petitioner signed for Lynn Plotkin on the partnership formation documents as her custodian, even though she has never had a custodian.  Petitioner never drafted Schedules K-1, Shareholder's Share of Income, Deductions, Credits, etc., for the partners.  From 1991 to 1994, petitioner also failed to draft financial statements, prepare partnership tax returns, or observe other partnership formalities with respect to Autumn Years.

On numerous occasions petitioner wrote himself checks on Autumn Years' accounts, using the funds to pay personal expenses.  Petitioner also wrote checks on Autumn Years' account to various family members and other entities.  From 1991 to 1994, Autumn Years received funds from various entities with ties to petitioner, as described below.

2.  Lease Between RHCA and Professional TLC

Ms. Faenger and petitioner had a personal relationship from approximately 1985 to 1990.  Ms. Faenger worked in the nursing home business and had experience operating a nursing home.

Petitioner helped Ms. Faenger incorporate Professional TLC, Inc. (Professional TLC), by drafting and filing the articles of incorporation and having Ms. Faenger sign the documents.  The plan was for Professional TLC to lease the Rolla nursing home

from RHCA, after which Ms. Faenger would operate the nursing home without interference by petitioner and pay rent to RHCA. The lease provided for monthly rent of $45,000 in the year beginning September 1, 1990, with yearly increases of $425. The amount of these rental payments was decided by petitioner, and he was the only party Ms. Faenger dealt with before signing the lease. The personal relationship between Ms. Faenger and petitioner had either ended or was in the process of ending at the time the lease was entered into in August 1990.

Professional TLC made the required monthly rent payments under the lease but did not always pay rent directly to RHCA. Many times Mr. Lavender would call Ms. Faenger and tell her that petitioner wanted a portion of that month's rent payment to be made to a different entity. Autumn Years received some payments directly from Professional TLC. Some checks written by Professional TLC to RHCA were endorsed over to Autumn Years, and sometimes the rent payments went to KSFS before KSFS would write a check or wire funds to Autumn Years. Autumn Years also received funds from La Mancha Properties, Inc., a corporation incorporated by Mr. Lavender which had financial ties to RHCA. Some of the lease payment funds also ended up with Quixoti Corp. (Quixoti), a corporation owned by petitioner whose funds were used in part for petitioner's personal expenses and which filed its 1991 income tax return several years late. Autumn Years

received funds from other companies with ties to petitioner as well.

RHCA failed to file partnership income tax returns for 1991 to 1994. At some point, RHCA stopped making its mortgage payments on the Rolla nursing home. In 1994 HUD demanded Professional TLC begin paying the entire lease payment directly to HUD. Following the advice of her attorney, Ms. Faenger instead made all the lease payments to an escrow account which was paid over to RHCA upon the sale of the Rolla nursing home in 1995 (the sale of the Rolla nursing home is discussed further below). As a result of RHCA's failure to make mortgage payments on a loan which HUD had insured, Mr. Lavender was convicted of theft of public money. As part of a plea agreement, Mr. Lavender agreed to cooperate with the Government in civil and criminal actions taken against petitioner.

3. Payments to Lynn Plotkin, Home Mortgage Interest and Property Taxes, and Business Expenses

A. Payments to Lynn Plotkin

Petitioner seeks to deduct payments made to his ex-wife during 1991 to 1994, which petitioner claims he made as a result of a corporate obligation he personally guaranteed.

Petitioner and Lynn Plotkin entered into a Stipulation for Property Settlement, Child Custody, Child Support, Maintenance, Attorney's Fees and Court Costs (divorce agreement) in January of 1984. Pursuant to the divorce agreement, petitioner agreed to

pay various amounts to Lynn Plotkin, including $75 per month per child for child support, $7,000 per year per child for schooling and summer programs (including 4 years of college), religious membership fees and celebration expenses, a share of the children's medical expenses not covered by insurance, attorney's fees, and court costs.  Because of ambiguous language in the divorce agreement, it is unclear when the obligation to pay the $75 per month support obligation was to end.  Petitioner also agreed to pay off any notes secured by the home in which he and Lynn Plotkin had lived and to repay Lynn Plotkin should she pay any of these amounts herself.  Petitioner forfeited any rights he had in the home and agreed to provide health insurance for each of the three children through his or her 22d birthday, as well as to cause a corporation to enter an agreement to buy Lynn Plotkin's interest in the Caring Group, Inc. (a corporation whose stock she owned), for $1,100,000.

In October 1983, in anticipation of the divorce agreement, Lynn Plotkin and Quixoti entered into an agreement whereby Quixoti promised to buy Lynn Plotkin's stock in the Caring Group, Inc., for $1,100,000.  Of the $1,100,000 total price, $800,000 (plus interest) was to be paid in monthly installments of $11,462 from March 1985 to October 1993 (the guaranteed Quixoti payments).  Petitioner personally guaranteed these monthly payments.

Petitioner made multiple payments to Lynn Plotkin in 1991, 1992, 1993, and 1994 which totaled $62,600, $60,000, $40,100, and $31,000, respectively. No single payment was equal to the agreed monthly installment amount of $11,462; the largest was $10,000 and the second largest was $5,000. The payments did not specify whether they were part of the guaranteed Quixoti payments or for some other obligation petitioner owed Lynn Plotkin. Many of the checks to Lynn Plotkin had no notation on them, while the notation on others appears to read only "N/P".

Petitioner failed to maintain health insurance for the children and also failed to pay off the outstanding notes on Lynn Plotkin's home, as required by the divorce agreement. Lynn Plotkin paid the notes off herself, and petitioner was required to indemnify her for these payments under the divorce agreement. The amounts petitioner owed Lynn Plotkin for other obligations beside the guaranteed Quixoti payments during 1991, 1992, 1993, and 1994 were not established. During at least part of the period from 1991 to 1994 each of the children was under the age of 22 and in college. Petitioner paid all or most of the older two childrens' tuition; however, Lynn Plotkin's family paid the entire tuition of the youngest child.

B. <u>Home Mortgage Interest and Property Taxes</u>

At one point during their personal relationship, petitioner and Ms. Faenger had plans to get married and move into a home

together.  To this end, they bought land in Rolla, Missouri, and began to build a home on the property.  The property was titled in Ms. Faenger's name in April 1988 although the $44,000 downpayment on the land was paid by petitioner.  Petitioner and Ms. Faenger borrowed money to build the house and became jointly and severally liable on a note for $425,000 from the American Bank of Rolla (American Bank) on May 16, 1989.  Petitioner made the loan payments.

In 1991, 1992, and 1993 petitioner paid interest on the loan financing construction of the home of $49,543, $39,271, and $41,282, respectively.  In addition, petitioner estimates he paid interest of $40,000 during 1994.  In 1991 he paid property taxes of $3,270 on the land.  Petitioner now seeks deductions for home mortgage interest and property taxes paid.

C.  Other Business Expenses

Petitioner claims that he incurred various legal expenses in connection with his business operations.  One of Autumn Years' accounts shows several checks written to Charles Merz, Esq. (Mr. Merz), who petitioner testified represented "both myself and the companies in several lawsuits that had been filed".

Petitioner claims that he made payments to Mr. Lavender and his companies.  Multiple checks were written to Mr. Lavender out of an Autumn Years account in 1991 and 1992 although the purpose of these payments was not established.

Petitioner claims he made a payment pursuant to a personal guaranty to Burnett Schwartz from a 1980s business transaction. A transfer was made to Mr. Schwartz out of an Autumn Years account in November 1991 with a notation that is mostly illegible but appears to read "HFTC" in part. The business purpose of the payments was not established.

Petitioner claims that he made many payments to American Bank as personal guarantor of a loan to RHCA. Many checks were written to American Bank out of an Autumn Years account with notations such as "Rolla Health Care" or "RHCA".

Petitioner claims that he incurred expenses in connection with assisting Kenneth Lohse in developing an auto repair business, and many checks were written to auto repair businesses out of an Autumn Years account. Petitioner also testified that he considered the payments a loan; however, nothing was written down.

Petitioner claims that he had various other expenses, such as maintaining his law license, Federal Express shipping costs, and office supply costs. Various checks were written out of an Autumn Years account to the Missouri Supreme Court, the Missouri Bar Association, the Missouri Department of Revenue, Federal Express, and Office Depot. Petitioner testified he used Federal Express to send items such as checks to Lynn Plotkin. Petitioner did not work as a lawyer during 1991 to 1994.

Petitioner claims that during 1991 he made payments to Quixoti so that Quixoti could pay its own business obligations. Several checks from 1991 were written to Quixoti out of an Autumn Years account.

Petitioner claims that in the course of business he incurred automobile repair expenses. Petitioner did all his traveling by car, and "on occasion" went to see Mr. Lavender by car. Several checks were written to various auto repair shops out of an Autumn Years account.

Petitioner also seeks to deduct bank fees of $428 and $223 for 1993 and 1994, respectively. The schedule of checks for an Autumn Years account shows that during 1993 and 1994 there were several overdraft charges, activity service charges, and other such charges.

4.  Sale of the Rolla Nursing Home

    A.  $588,000 Commission

Once RHCA stopped making payments on the Rolla nursing home mortgage insured by HUD, HUD threatened to foreclose on the property. HUD eventually set a foreclosure sale for July 14, 1995. To avoid foreclosure, petitioner and Mr. Lavender subsequently attempted to sell the Rolla nursing home.

Petitioner lived with his girlfriend, Barbara Nemec (Ms. Nemec), at the time. Ms. Nemec was a registered dietician who provided nutrition consulting services to various nursing homes.

Petitioner and Ms. Nemec had known each other since 1986 or 1987, and their personal relationship began in 1992 or 1993.

When Ms. Nemec learned the Rolla nursing home was to be sold, she expressed interest in trying to find a buyer. Although Ms. Nemec had no prior real estate experience, her brother, Bob Nemec, had significant real estate experience as owner of a brokerage business. Ms. Nemec incorporated LTC Brokers & Consultants, Inc. (LTC), in Illinois on May 23, 1995, becoming the president and sole shareholder. LTC also employed Bob Nemec. Ms. Nemec also incorporated LV Castle Investment Group, Inc. (LV), in Illinois to act as the parent corporation of LTC.

In January 1995 RHCA executed several documents with LTC (which had not yet been incorporated at the time). Mr. Lavender signed the documents on behalf of RHCA and Ms. Nemec signed on behalf of LTC. The documents authorized LTC to act as RHCA's agent for the purpose of selling the Rolla nursing home and entitled LTC to a base commission of 10 percent of the selling price. In addition to the base commission, LTC would receive an extra 2 percent in return for LTC's obtaining, at its own expense, all necessary studies, analyses, and other information in connection with the sale. The documents also called for LTC to receive an additional 2 percent in return for LTC's agreement that its arrangement with RHCA was nonexclusive and that LTC

would receive no compensation if RHCA sold the facility itself or through another broker.

Mr. Lavender testified that he thought the initial brokerage fee was to be around 2 or 3 percent, which was increased "just prior to the sale". He further testified that petitioner wanted as large a commission as possible, because the commission was the means by which petitioner would be taking his slice of the proceeds. At the criminal trial Mr. Lavender testified that he thought the brokerage fee was originally to be around 4 or 5 percent.

Ms. Nemec found a buyer for the Rolla nursing home, American Capital Corp. (American), and Ms. Nemec and Bob Nemec worked to complete the sale, incurring expenses on behalf of LTC. In June 1995 RHCA and American closed on the sale of the Rolla nursing home for $4.2 million. RHCA's ownership of the Rolla nursing home terminated June 30, 1995.

Mr. Lavender asked petitioner what should be done with the over $1 million in net proceeds which RHCA received as a result of the sale. Petitioner told Mr. Lavender to use the proceeds to repair Mr. Lavender's financial situation and make himself whole.

As a result of the sale, LTC received $588,000 in commissions via checks which were deposited into LTC's bank account on July 3, 1995. Following the sale of the Rolla nursing home, LTC purchased property in Umatilla, Florida. A month or

two after LTC purchased the property, title was transferred to Ms. Nemec. Ms. Nemec and petitioner moved into a home on the property and continue to live there together.

The State of Illinois dissolved both LTC and LV on October 1, 1996, for failing to file annual reports or pay annual franchise taxes. The sale of the Rolla nursing home was the only real estate LTC or LV ever sold. LTC and LV reported $602,962 in gross income on their consolidated corporate income tax return for the fiscal year ending June 30, 1996, which was not filed until June 2001. The return was prepared by Charles Bratkowski, a certified public accountant. Ms. Nemec asked petitioner to assist Mr. Bratkowski in preparing the return; petitioner did although the extent of his assistance is unclear. LV's consolidated return reflected gross receipts of $602,962, costs of sales of $293,139, various other deductions of $143,221, and taxable income of $166,602.

B. $245,000 Payment to American Bank

A separate issue arose with regard to a $245,000 payment RHCA made to American Bank after the sale of the Rolla nursing home. Respondent claims that the $245,000 was, in part, used to pay off petitioner's liability on the loan petitioner and Ms. Faenger had taken out from American Bank to build the home in Rolla. The home (which may not have been completed at the time) was sold in December 1993, with amounts remaining unpaid on the

$425,000 loan. Ms. Faenger borrowed $30,000 from her mother and paid that amount to American Bank to be released from liability on the loan, although petitioner still remained liable.

RHCA had taken out a loan of $115,000 from American Bank in December 1990 and was scheduled to pay back such loan over 48 months in installments of $3,028, with the last payment being made in December 1994. On June 30, 1995, RHCA paid American Bank $245,000 out of the sale proceeds. On the same day, amounts of $12,729.22, $1,112.43 and $13,912.59 were credited to RHCA's balance, reducing the amount outstanding to zero. Respondent contends the remaining $217,246 was used to pay off petitioner's remaining liability on the $425,000 home construction loan.

Petitioner's remaining liability on the loan was paid off at some unknown point. Although in this case Ms. Faenger testified she did not know how it was paid off, during the criminal trial she testified that it was paid out of the proceeds of the nursing home sale. The amount of petitioner's remaining liability at the time the $245,000 was paid to American Bank was not established.

5.  Other Information

Petitioner did not file his 1991, 1992, or 1993 Federal income tax return until August 1994 and had no reason for the delay. The 1991 return included "other income" of $46,560 and taxable income of $19,680. Quixoti's 1991 corporate income tax return reported $46,560 as a "compensation of officers" expense.

The 1992 return included "other income" of $34,269 and taxable income of $23,519.  The 1993 return included "other income" of $24,360 and taxable income of $13,610.  Management & Development Associates, Inc.'s 1992 and 1993 corporate income tax returns reported "compensation of officers" expenses of $34,269 and $24,360, respectively.  Petitioner never filed an income tax return for 1994 or 1995.  Petitioner made no estimated tax payments for tax years 1994 and 1995 and paid no self-employment taxes for 1991 through 1994.

In 1999 petitioner was indicted on three willful violations of section 7206(1)--one count with respect to each of his income tax returns for the years 1991, 1992, and 1993.  The U.S. District Court for the Eastern District of Missouri convicted petitioner on each count, finding that petitioner willfully reported his income falsely for 1991, 1992, and 1993.

On April 22, 2008, respondent issued a notice of deficiency to petitioner for tax years 1991, 1992, 1993, 1994, and 1995.  Petitioner timely filed a petition contesting the deficiencies, additions to tax, and penalties.

OPINION

I.  Burden of Proof

Generally, taxpayers bear the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect.  Rule

142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992). However, on several issues in this case petitioner argues that the burden of proof should be placed on respondent. We will address these arguments below in conjunction with the related issues.

II. <u>Whether Petitioner Underreported or Failed To Report Schedule C Income for 1991-94</u>

Respondent argues that the money deposited into Autumn Years and Quixoti accounts from 1991 to 1994 should be included as petitioner's Schedule C income. Petitioner makes several counterarguments detailed below.

A. <u>Burden of Proof</u>

Petitioner argues that respondent bears the burden of proving that petitioner has deficiencies for 1991 to 1994 because respondent's determinations for those years were arbitrary and erroneous. See, e.g., <u>Jackson v. Commissioner</u>, 73 T.C. 394 (1979). Petitioner claims that Autumn Years is in fact a sham corporation and that it has no separate identity from that of petitioner. As a result, petitioner argues that Autumn Years' 99-percent limited partnership interest in RHCA should be imputed to petitioner. This would have the effect of making the amounts petitioner received not Schedule C income but rather

distributions made by RHCA to a partner since the funds Autumn Years received came to it as a holder of a partnership interest in RHCA. Such distributions would be taxable only to the extent they exceeded petitioner's basis in his interest in RHCA. Petitioner concludes that because the notice of deficiency treated all funds received by Autumn Years as Schedule C income to petitioner, rather than as partnership distributions, respondent's determinations are arbitrary and erroneous and that the burden of proof is therefore placed on respondent. We disagree.

Petitioner was not a partner in either Autumn Years or RHCA. Petitioner cites no legal authority for his claim that he should be considered to own Autumn Years' 99-percent limited partnership interest in RHCA. The Supreme Court has observed that while a taxpayer is free to organize his affairs as he chooses, once having done so he must accept the tax consequences of his choice, whether contemplated or not. Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974). Petitioner could have made himself a partner of RHCA but chose not to. Petitioner cannot now benefit by redefining the role he created. Accordingly, we find the burden of proof remains on petitioner.

B. Period of Limitations for Years 1991-93

With respect to 1991, 1992, and 1993, petitioner contends that the normal 3-year period of limitations to issue a notice of

deficiency under section 6501(a) has expired.  Respondent argues section 6501(c)(1) applies because petitioner's 1991, 1992, and 1993 income tax returns were fraudulent and the tax may therefore be assessed at any time.  For reasons stated below, we find that petitioner's returns for 1991, 1992, and 1993 were fraudulent.  See infra pp. 39-44.  Taxes for these years may therefore be assessed at any time.

> C.  Payments to Autumn Years and Quixoti Accounts From Various Entities

Respondent contends that all payments made into Autumn Years and Quixoti accounts from 1991 to 1994 constitute Schedule C income to petitioner.  Petitioner does not dispute the fact that the funds deposited into those accounts are his.  However, petitioner argues that those funds are not Schedule C income; rather, the funds are partnership distributions to petitioner from RHCA, taxable only to the extent they exceeded petitioner's basis in his interest in RHCA.  To this end, petitioner again claims that Autumn Years is in fact a sham corporation and that Autumn Years' 99-percent limited partnership interest in RHCA should be imputed to petitioner.  However, for the same reasons stated hereinabove, we find that petitioner does not hold a 99-percent limited partnership interest in RHCA.  See supra p. 21.  Therefore, the funds deposited into the accounts of Autumn Years and Quixoti did not constitute partnership distributions to petitioner because petitioner was not a partner of RHCA.

Petitioner would have us believe that Mr. Lavender, not petitioner, ran RHCA and made payments to Autumn Years/petitioner as the holder of a 99-percent limited partner interest. While we do believe Mr. Lavender had some control over RHCA (as he was able to embezzle significant amounts of money from RHCA and was convicted of theft of public money when RHCA stopped making mortgage payments on a loan which HUD had insured), we find that petitioner also had a significant amount of operational control over RHCA and was integral in the running of RHCA. Not only was petitioner active in carrying on the major business of RHCA (negotiating the lease agreement with Ms. Faenger and Professional TLC, looking for a buyer of the Rolla nursing home before LTC found a buyer), he also told Mr. Lavender what to do with the lease payments made to RHCA from Professional TLC and told Mr. Lavender to make himself whole from the proceeds of the sale of the nursing home. Petitioner was also able to steer funds from RHCA to American Bank in 1995 to pay off petitioner's liability for a home construction loan on which petitioner was liable. See infra pp. 37-38. We therefore find the payments to petitioner were made as a result of his work in carrying on the business of RHCA and related entities.

Instead of taking possession of the funds directly from RHCA, petitioner diverted the funds through various entities into the accounts of Autumn Years and Quixoti, which he fully

controlled.  Income is taxable to the taxpayer who earns it.

Lucas v. Earl, 281 U.S. 111, 114-115 (1930).  When a taxpayer

assigns income to a nominee partnership he controls, he is

taxable on the income.  Levitt v. Commissioner, T.C. Memo. 1995-

464, affd. without published opinion 101 F.3d 691 (3d Cir. 1996).

We conclude that respondent properly included the payments into

the accounts of Autumn Years and Quixoti in petitioner's Schedule

C income for 1991, 1992, 1993, and 1994.

D.  Other Deductions

Petitioner claims that he was entitled to additional

deductions from income.

1.  Payments to Lynn Plotkin

Petitioner made multiple payments to Lynn Plotkin in 1991,

1992, 1993, and 1994 which totaled $62,600, $60,000, $40,100, and

$31,000, respectively.  Petitioner claims all of these payments

went towards paying the $11,462 monthly payment Quixoti was

required to pay to Lynn Plotkin, amounts petitioner personally

guaranteed.  Petitioner claims such amounts are therefore

deductible under section 162(a) as ordinary and necessary

business expenses.  Section 162(a) provides that, in general,

"There shall be allowed as a deduction all the ordinary and

necessary expenses paid or incurred during the taxable year in

carrying on any trade or business".

We disagree with petitioner.  Petitioner failed to establish what obligations to Lynn Plotkin the payments were being made toward.  Petitioner not only owed Lynn Plotkin for the guaranteed Quixoti payments; he also owed her money as a result of his indemnification of her payments on outstanding notes on her home. The payments to Lynn Plotkin may have also been made toward providing the children with health insurance, which petitioner failed to supply as had been required by the divorce agreement. The money may have also gone toward paying the $7,000 tuition obligation for the youngest child, whose tuition was paid entirely by Lynn Plotkin's family.  The money may have also gone toward paying the $75 per child per month support obligation or any other items petitioner may have been responsible for, such as medical expenses.  Check notations did not specify what obligation the payments were being made toward.

Not only did evidence not establish what obligations the payments were being made toward; the amounts of the individual payments do not support a conclusion that they were being made toward the guaranteed Quixoti payments.  No single payment was equal to the agreed monthly installment amount of $11,462; the largest was $10,000 and the second largest was $5,000.

We conclude that petitioner has not met his burden of proving that the payments to Lynn Plotkin were expenses paid in

carrying on a trade or business.  Therefore, petitioner may not deduct those amounts under section 162(a).

2.  Home Interest and Property Taxes

Petitioner claims section 163 deductions for interest paid on the loan financing the construction of the house petitioner planned to live in with Ms. Faenger.  Petitioner also claims a section 164 deduction for property taxes paid on the property in 1991.  In 1991, 1992, and 1993 petitioner paid interest on the loan of $49,543, $39,271, and $41,282, respectively.  In addition, petitioner estimates he paid interest of $40,000 during 1994.  In 1991 petitioner paid property taxes of $3,270 on the land.

Section 163(h)(2)(D) allows a deduction for qualified residence interest.  A "qualified residence" is the taxpayer's principal residence or one other residence of the taxpayer which is selected by the taxpayer for purposes of the deduction and which is used by the taxpayer as a residence within the meaning of section 280A(d)(1).  Sec. 163(h)(4)(A).  Effective for tax years beginning in 1987, section 1.163-10T, Temporary Income Tax Regs., 52 Fed. Reg. 48410 (Dec. 22, 1987), allows a taxpayer to treat a residence under construction as a qualified residence for a period of up to 24 months, but only if the residence becomes a qualified residence at the time the residence is ready for occupancy.

Under sections 280A(d) and 163(h)(4)(A), the home may have been considered a qualified residence had petitioner or Ms. Faenger lived in the home. However, there was no testimony or other evidence that petitioner or Ms. Faenger ever lived in the home or that the home was completed by the time it was sold in December 1993. Since there is no evidence to support that the home ever became a qualified residence of petitioner, we find petitioner has not proven his entitlement to deductions under section 163(h)(2) for qualified residence interest.

Section 164 allows a deduction for certain taxes, including State and local real property taxes. In general, taxes are deductible only by the person upon whom they are imposed. See Tuer v. Commissioner, T.C. Memo. 1983-441; sec. 1.164-1(a), Income Tax Regs. However, we have held that taxpayers who do not hold legal title to property but who establish they are equitable owners of the property are entitled to deduct property taxes they paid for the property. Daya v. Commissioner, T.C. Memo. 2000-360; Trans v. Commissioner, T.C. Memo. 1999-233.

Ms. Faenger held legal title to the house and was therefore the person upon whom the property tax was imposed. Petitioner did not argue that he was the equitable owner of the house. Therefore, we find petitioner has not established his entitlement to a deduction for the property taxes paid.

3. <u>Business Expenses</u>

Petitioner claims a number of other section 162(a) business expense deductions.

Petitioner claims deductions for legal expenses in connection with his business operations. Petitioner means to prove such expenses by a showing that several checks were written to Charles Merz, Esq., whom petitioner testified represented "both myself and the companies in several lawsuits that had been filed." However, no evidence was offered as to what business operations the lawsuits related to. There was also no explanation of why petitioner was paying these expenses out of an Autumn Years account he used for personal expenditures, rather than company accounts, or why the companies were not claiming the deductions themselves. Finally, petitioner did not explain why the lawyer was representing both petitioner and the companies jointly. Given such a dearth of supporting evidence, we find petitioner has not proven entitlement to a section 162(a) deduction for legal expenses.

Petitioner claims deductions for payments made to Mr. Lavender and his companies in 1991 and 1992. However, the business purpose of the payments was not established. Therefore, we find petitioner has not proven entitlement to a section 162(a) deduction for these payments.

Petitioner claims a deduction for a payment he made to Burnett Schwartz pursuant to a personal guaranty, from a 1980s business transaction. However, no evidence substantiating the guaranty or the business purpose of the payment was produced. Therefore, we find petitioner has not proven entitlement to a section 162(a) deduction for this payment.

Petitioner claims a deduction for payments made to American Bank as personal guarantor of a loan made to RHCA. Petitioner did make many payments to American Bank out of an Autumn Years account, with notations such as "Rolla Health Care" and "RHCA". However, petitioner failed to produce any evidence that he was the guarantor of any such loan made to RHCA, or that such payments were made for the purpose petitioner claimed. We find petitioner has not proven entitlement to a section 162(a) deduction for these payments.

Petitioner claims a deduction for expenses in connection with assisting Kenneth Lohse in developing an auto repair business. Several checks were written on an Autumn Years account to various car repair dealerships. However, petitioner also testified that he considered the payments a loan. In addition, other evidence relating to the purpose of the payments was not produced. Therefore, we find petitioner has not proven entitlement to a section 162(a) deduction for these payments.

Petitioner claims deductions for various other expenses, such as maintaining his law license, Federal Express shipping costs, and office supply costs. Various checks were written on an Autumn Years account to the Missouri Supreme Court, the Missouri Bar Association, the Missouri Department of Revenue, and Federal Express. One check was written to Office Depot. However, petitioner did not establish a business purpose with respect to the Office Depot payment, and we therefore find he has not proven entitlement to a section 162(a) deduction for that payment. Petitioner testified he used Federal Express to send items such as checks to Lynn Plotkin, and we have already found petitioner is not entitled to section 162(a) deductions for the payments to Lynn Plotkin. Petitioner did not work as a lawyer during 1991 to 1994. Therefore, the payments made to Federal Express and for law license fees were not expenses paid or incurred in carrying on a trade or business, and we find petitioner is not entitled to section 162(a) deductions for those payments.

Petitioner claims deductions for payments made to Quixoti in 1991 so that Quixoti could pay its own business obligations. Several checks from 1991 were written to Quixoti out of an Autumn Years account. However, the business purpose of the payments was not established. In addition, Quixoti funds were used in part to pay personal expenses of petitioner. Therefore, we find

petitioner has not proven entitlement to a section 162(a) deduction for these payments.

Petitioner claims deductions for automobile repair expenses incurred in the course of business travel. Petitioner did all his traveling by car and "on occasion" went to see Mr. Lavender by car. Several checks were written to various auto repair shops on an Autumn Years account. However, no other evidence was produced and no portion of the payments was listed as personal expenses. We find petitioner has not proven entitlement to a section 162(a) deduction for these payments.

Petitioner claims deductions for bank fees of $428 and $223 for 1993 and 1994, respectively. The schedule of checks from an Autumn Years account shows that during 1993 and 1994 there were several overdraft charges, activity service charges, and other such charges. However, the business purpose of the charges was not established. Therefore, we find petitioner has not proven entitlement to a section 162(a) deduction for these charges.

E.  Conclusion on 1991-94 Income

We sustain respondent's determinations that petitioner underreported Schedule C income for 1991, 1992 and 1993 by $302,319, $172,081, and $138,490, respectively. We also sustain respondent's determinations that petitioner failed to report Schedule C income for 1994 of $135,611. In addition, we find petitioner is not entitled to the various deductions he claims.

III.  Whether Petitioner Is Liable for Self-Employment Taxes for 1991-94

Respondent argues that petitioner is liable for self-employment taxes for 1991 through 1994.  Every individual is subject to tax equal to 15.3 percent of net earnings from self-employment, subject to certain limits on income.  Secs. 1401 and 1402.  "Net earnings from self-employment" includes income derived by an individual from carrying on a trade or business and the distributive share of income or loss from any trade or business carried on by a partnership of which the individual is a member.  Sec. 1402(a).  An exception exists for distributive shares of any item of income or loss of limited partners.  Sec. 1402(a)(13).

Petitioner's sole argument is that Autumn Years has no separate identity from that of petitioner and that he should therefore be deemed to hold a 99-percent limited partnership interest in RHCA and be entitled to the section 1402(a)(13) exception from self-employment taxes.  For the same reasons previously stated, we reject petitioner's theory that he is a limited partner in RHCA.  See supra p. 21.

Petitioner was not a partner in RHCA.  In addition, petitioner helped to carry on the business of and had a significant amount of operational control over RHCA; he negotiated the lease agreement with Ms. Faenger and Professional

TLC, told Mr. Lavender which companies the lease payments should be made to and attempted to find a buyer for the Rolla nursing home before LTC did. As a result of his work, petitioner was paid by RHCA (which he attempted to disguise using various entities). We find petitioner does not fall under the limited partner exception and is subject to self-employment taxes for 1991, 1992, 1993, and 1994 of $10,247, $10,658, $10,851, and $11,146, respectively.

IV. Whether Petitioner Failed To Report Schedule C Income for 1995

A. Burden of Proof

Petitioner argues that respondent bears the burden of proving that petitioner has a deficiency for 1995 because respondent's determination for that year was a naked assertion and therefore arbitrary and erroneous. It is true that respondent cannot "'rely solely upon the naked assertion that * * * [petitioner] received a certain amount of unreported income'" and that a "'naked assessment without any foundation is arbitrary and erroneous'". Senter v. Commissioner, T.C. Memo. 1995-311 (quoting Portillo v. Commissioner, 988 F.2d 27, 29 (5th Cir. 1993)); see also United States v. Janis, 428 U.S. 433, 441 (1976). Petitioner argues respondent presented no substantive evidence on this issue to support respondent's deficiency claim. We disagree.

Respondent's determination is supported by the closing documents from the sale of the Rolla nursing home, checks and statements from the closing and from Barbara Nemec and LV Castle, Inc., American Bank loan documents, and testimony from petitioner and Ms. Nemec. We find this is substantive evidence to support respondent's deficiency determination and that no naked assertion was made. The burden of proof therefore remains with petitioner.

B. $588,000 Commission Paid by RHCA to LTC

Respondent claims the $588,000 commission paid to LTC from RHCA after the sale of the Rolla nursing home was a tax-avoidance scheme set up by petitioner and that the funds should be imputed to petitioner. In support of his argument respondent relies on (1) Mr. Lavender's testimony that petitioner used the commission as a means to take his slice of the sale; (2) events surrounding the incorporation and dissolution of LTC and LV; (3) petitioner's assistance in the preparation of the LV consolidated tax return; (4) the fact that the proceeds were used to buy a house where petitioner now resides; and (5) petitioner's history of using nominees to disguise his income. Petitioner disputes the testimony of Mr. Lavender and claims that LTC and LV were bona fide corporations whose employees closed the sale. Considering the evidence, we find petitioner has met his burden of proof and that the $588,000 commission should not be imputed to him.

We believe Mr. Lavender's testimony is inconsistent and not credible on this issue. He testified that he believed the initial brokerage fee was to be around 2 or 3 percent, while at the criminal trial he testified the brokerage fee was originally to be around 4 or 5 percent. He further testified that the commission was increased "just prior to the sale" although he had signed the documents providing for a 14-percent commission in January, nearly 6 months before the sale. In addition, Mr. Lavender admitted to having stolen significant amounts of money which would have otherwise come under petitioner's control and was testifying for respondent as part of a plea agreement in connection with his conviction for theft of public money.

LTC and LV were incorporated about a month before the sale closing. However, Ms. Nemec and Bob Nemec had been working on behalf of the nonexistent LTC since at least January 1995, and there is nothing uncommon about doing work on behalf of a corporation before incorporation. See, e.g., Frazier v. Ash, 234 F.2d 320 (5th Cir. 1956) (discussing entering contracts on behalf of a corporation before its incorporation).

The dissolution of LV and LTC in October of 1996 for failure to file an annual report or pay franchise taxes, the late filing of the LV consolidated tax return and petitioner's assistance in preparing that return, the fact that Ms. Nemec was petitioner's girlfriend and also the president and sole shareholder of LTC,

and the fact that LTC bought the home in which petitioner now resides and transferred title to Ms. Nemec a month or two later are stronger points for respondent. Considering petitioner's history of using nominees to avoid tax liability, the facts further suggest that petitioner was pulling the strings at LTC in order to avoid tax on the $588,000 and to buy himself a home with the money. However, these facts are also speculative; and while we admit the transaction contains indicia of tax avoidance, we find they do not overcome the facts favoring petitioner.

LTC and LV were validly created corporations. They filed a consolidated income tax return showing gross receipts of $602,962 and taxable income of $166,602 for the fiscal year ending June 30, 1996. Other facts more directly counter respondent's assertion that petitioner was pulling the strings of LTC. Although Ms. Nemec was petitioner's girlfriend, she had significant contacts in the nursing home industry. In addition, Bob Nemec was also an employee of LTC and had significant real estate experience as owner of a brokerage business. It is quite probable that two such siblings would be interested in and capable of working together to sell a nursing home. Most importantly, Ms. Nemec found the buyer for the Rolla nursing home, and she and Bob Nemec worked to close the sale.

Although it is a close call, we find that petitioner has met his burden of proving that the $588,000 commission was not part

of a tax-avoidance scheme that he set up.  If there are tax issues in connection with the commission paid to LTC, respondent may seek to collect from LTC and LV or from Ms. Nemec and Bob Nemec.

C.  $245,000 Paid by RHCA to American Bank

Of the $245,000 paid to American Bank from RHCA after the sale of the nursing home, a total of $27,754 was used to pay off the remaining amount of a $115,000 working capital loan between American Bank and RHCA.  Respondent contends that the remaining $217,246 was used to pay off petitioner's remaining personal liability on the $425,000 home construction loan and should be included in petitioner's 1995 income.

The remaining amount of the $425,000 loan to Ms. Faenger and petitioner was paid off at some unknown point.  Although in this case Ms. Faenger testified she did not know how it was paid off, during petitioner's criminal trial she testified that it was paid off with the proceeds of the nursing home sale.  On the same day the $245,000 payment was made to American Bank only $27,754 was used to pay off the remainder of RHCA's $115,000 loan.  American Bank was the same bank which lent petitioner and Ms. Faenger the $425,000.

Petitioner has offered no evidence as to what the remaining $217,246 was paid toward.  In his posttrial brief petitioner merely states:  "it is impossible to determine whether that

$245,000 was paying off the loan obtained by Petitioner and Ms. Faenger * * * to construct the home, whether it was paying off the [RHCA] working capital loan, some combination of the two, or perhaps some other indebtedness." In addition to offering no evidence concerning what the $217,246 was paid toward, petitioner offered no evidence showing that he paid off his personal liability for the remaining amount of the $425,000 loan by some other means.

There is a dearth of evidence with respect to this issue. However, because the burden of proof is on petitioner, who has presented only unsupported speculation, we find that the $217,246 was income to petitioner in 1995.

Petitioner argues that if the $217,246 is income to him, some of the income should be attributed to Ms. Faenger because she was jointly liable with him on the $425,000 loan. However, Ms. Faenger had borrowed $30,000 from her mother to pay to American Bank in order to have her liability on the loan discharged. Therefore, the entire $217,246 is income to petitioner.

V. Whether Petitioner Is Liable for Additions to Tax Under Section 6654 for 1994 and 1995

Respondent also determined additions to tax for 1994 and 1995 for failure to pay estimated tax. Section 6654(d)(1)(B) provides that a taxpayer's required annual payment is limited to the lesser of 90 percent of the tax shown on the return for the

taxable year (or, if no return is filed, 90 percent of the tax for such year), or 100 percent of the tax shown on the return of the individual for the preceding taxable year. Petitioner's sole argument is that he is not liable for the addition to tax because he had no tax liability for 1994 or 1995. We have already held petitioner was liable for taxes for both 1994 and 1995. See supra pp. 31-32, 38. Therefore, petitioner is liable for section 6654 additions to tax. The amount of those additions to tax shall be determined by the parties in their Rule 155 computations in accordance with the other holdings herein.

VI.  Whether Petitioner Is Liable for the Section 6663 Fraud
     Penalty for 1991-93 and the Section 6651(f) Fraudulent
     Failure To File Addition to Tax for 1994 and 1995

Respondent has the burden of proving fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). To satisfy the burden of proof, respondent must show: (1) An underpayment of tax exists; and (2) petitioner intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Sadler v. Commissioner, 113 T.C. 99, 102 (1999); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).

A.  Underpayment of Tax.

The clear and convincing standard applies not merely to whether an underpayment is attributable to fraud, but also to whether an underpayment exists. Parks v. Commissioner, supra at

660-661; Di Rocco v. Commissioner, T.C. Memo. 2009-300; DeClercq
v. Commissioner, T.C. Memo 1982-386.  Where fraud is determined
for each of several years, the Commissioner's burden applies
separately for each of the years.  Roth v. Commissioner, T.C.
Memo. 1998-28.  Considering the facts and law discussed
hereinabove, we hold that respondent has proven by clear and
convincing evidence that an underpayment existed in each year for
1991 to 1994.  However, we hold respondent has not proven by
clear and convincing evidence that an underpayment exists for
1995.

In order to prove an underpayment, the Commissioner cannot
rely on the presumption of correctness of the statutory notice of
deficiency.  See DiLeo v. Commissioner, 96 T.C. 858, 873 (1991),
affd. 959 F.2d 16 (2d Cir. 1992).  Fraud is never presumed; even
if a taxpayer's testimony is incredible, we may still be left
with no more than a suspicion of fraud.  Rinehart v.
Commissioner, T.C. Memo. 1983-184.  Suspicion, even a strong
suspicion, of fraud will not sustain the Commissioner's
determination.  Wynn v. Commissioner, T.C. Memo. 1995-609.

Although we previously held that an underpayment of tax
existed for 1995, that holding was based on the fact that the
burden of proof was on petitioner, who offered only speculation
as to what the $245,000 was paid toward and how his home
construction loan liability was paid off.  See supra pp. 37-38.

As the burden of proof is now on respondent, we must consider the strength of respondent's evidence as well.  Respondent relies on the facts that:  (1) The home construction loan was paid off; (2) RHCA paid $245,000 to American Bank after the sale of the nursing home, of which only $27,754 was used to pay off the remaining amount of a $115,000 working capital loan between American Bank and RHCA; (3) American Bank was the same bank which had given petitioner the home construction loan; and (4) Ms. Faenger testified at petitioner's criminal trial that the loan was paid out of the proceeds of the nursing home sale.

Respondent's first three points are speculative, as there was no evidence showing any part of the $245,000 was actually paid toward petitioner's home construction loan.  Additionally, respondent never presented evidence showing when the home construction loan was paid off or what petitioner's remaining liability on the home construction loan was at the time the $245,000 was paid to American Bank.  While not speculative, respondent's fourth point is marred by the fact that Ms. Faenger gave conflicting testimony during this trial, stating that she did not know how the home construction loan was paid off. Considering the evidence presented, we hold that respondent failed to meet his burden to show by clear and convincing evidence an underpayment existed.

B.  Fraudulent Intent

Respondent must prove by clear and convincing evidence that a portion of the underpayment for each taxable year in issue was due to fraud.  See Professional Servs. v. Commissioner, 79 T.C. 888, 930 (1982).  Once respondent establishes that any portion of the underpayment is attributable to fraud, the entire underpayment is subject to the 75-percent penalty, except with respect to any portion of the underpayment that petitioner establishes is not attributable to fraud.  See sec. 6663(a) and (b).  The existence of fraud is a question of fact to be resolved upon consideration of the entire record.  King's Court Mobile Home Park, Inc. v. Commissioner, 98 T.C. 511, 516 (1992).  The taxpayer's entire course of conduct may establish the requisite fraudulent intent.  Stone v. Commissioner, 56 T.C. 213, 223-224 (1971).

In deciding whether a failure to file is fraudulent under section 6651(f), we consider the same elements that are considered in imposing the penalty for fraud under section 6663. Clayton v. Commissioner, 102 T.C. 632, 653 (1994); Tinnerman v. Commissioner, T.C. Memo. 2006-250.  Because direct proof of a taxpayer's intent is rarely available, fraud may be proved by circumstantial evidence and reasonably inferred from the facts. Spies v. United States, 317 U.S. 492, 499 (1943); Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); Rowlee v. Commissioner, 80

T.C. 1111, 1123 (1983).  Certain indicia, commonly known as badges of fraud, constitute circumstantial evidence which may give rise to a finding of fraudulent intent.  Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

A taxpayer's use of a complex series of financial transactions and nominees is a badge of fraud.  See Graham v. Commissioner, T.C. Memo. 2005-68, affd. 257 Fed. Appx. 4 (9th Cir. 2007).  Petitioner was connected with an extensive network of corporations and partnerships which had financial dealings with one another and with petitioner.  Petitioner also used Autumn Years and Quixoti to hold money which he used for personal spending.  He used his control over RHCA and other entities to further conceal the fact that he was receiving income.

Petitioner's conviction under section 7206(1) is also a badge of fraud.  While the convictions under section 7206(1) for years 1991 to 1993 do not estop petitioner from denying fraud for these years, they are persuasive evidence of fraud.  See Morse v. Commissioner, T.C. Memo. 2003-332, affd. 419 F.3d 829 (8th Cir. 2005); Parsons v. Commissioner, T.C. Memo. 2000-205.

Another badge of fraud is keeping inadequate records. Bradford v. Commissioner, supra at 307-308.  In this case, petitioner failed to keep any financial records for Autumn Years or to send Schedules K-1 to the partners of Autumn Years.

Failure to file tax returns is also a badge of fraud. <u>Id.</u> at 307. Petitioner did not file a personal tax return for 1994. He failed to file various tax returns for Autumn Years. RHCA, a company over which petitioner had a significant amount of control, failed to file tax returns for years 1991 to 1994. Petitioner's 1991 to 1993 tax returns were not filed until August 1994. Several of the other entities with ties to petitioner filed late tax returns, sometimes many years late.

An understatement of income is also a badge of fraud. <u>Id.</u> We have already found that petitioner had significant understatements of income for 1991 to 1994. See <u>supra</u> pp. 22-32.

Considering the evidence, we find respondent has proven by clear and convincing evidence that the underpayments for the taxable years 1991 to 1994 were due to fraud. Petitioner is therefore subject to the section 6663 fraud penalty for years 1991 to 1993 and the section 6651(f) fraudulent failure to file addition to tax for 1994.

VII. <u>Conclusion</u>

We find petitioner liable for underreporting or failure to report Schedule C income for years 1991, 1992, 1993, 1994, and 1995 of $302,319, $172,081, $138,490, $135,611, and $217,246, respectively. Further, we find petitioner liable for self-employment taxes for years 1991, 1992, 1993, and 1994 of $10,247,

$10,658, $10,851, and $11,146, respectively.  We also find petitioner liable for estimated tax additions to tax under section 6654 for years 1994 and 1995.  Finally, we find petitioner liable for fraud penalties under section 6663 for years 1991, 1992, and 1993, and liable for the fraudulent failure to file addition to tax under section 6651(f) for 1994.

In reaching our holdings herein, we have considered all arguments made, and, to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.